BROWN, Appellant, v. TRINIDAD ASPHALT
MANUFACTURING COMPANY.

**Division Two, March 17, 1908.**

1. **CONTRACT: To Sell or to Manufacture?** Where the contract is upon its face clearly one of purchase and sale, and the petition alleges that plaintiff "sold and had for some time thereto been selling to the defendant asphalt produced and manufactured by plaintiff, and that defendant neglected, failed and refused at and during the time in said contract specified therefor, or at all, to purchase and pay for the asphalt in said contract by it agreed to be purchased and paid for," it will not be held to be a contract to manufacture, although it reveals a seeking by defendant of an exclusive agency for certain territory for the sale of the asphalt manufactured by plaintiff.

2. ————: **Sale: Breach: Measure of Damages.** And such contract being one of purchase and sale, and defendant having failed to perform, plaintiff can recover only nominal damages, if he has no evidence of the market value of the asphalt sold. He is not entitled to recover the cost value to plaintiff of the asphalt or the contract price.

3. ————: ————: ————: ————: **General Rule.** Where the vendor sues the vendee for the non-acceptance of property sold or contracted for, the breach on the vendee's part being admitted, the measure of damages is the difference between the contract price and the market value at the time and place of delivery.

4. ————: ————: ————: ————: ————: **Presumption of Goods On Hand: Nominal Damages.** In a contract for the sale of property the presumption is that the vendor has the property on hand, there being no evidence to the contrary, and the vendee having refused to accept the property according to the terms of the contract, the vendor is entitled to recover as damages the difference between the contract price and the market price, if any, of his goods. And if no market price is shown, he can recover only nominal damages.

Appeal from St. Louis City Circuit Court.—*Hon. Moses N. Sale*, Judge.

AFFIRMED.

*Virgil Rule* and *Bland & Cave* for appellant.

(1) The contract, for the breach of which this suit was brought, is a contract to manufacture. The situation of the parties, plaintiff being, and being known by defendant to be, a manufacturer, and defendant seeking to obtain the exclusive agency in certain territory for the sale of plaintiff's goods, and their previous dealings, clearly indicate that this contract was understood to be a manufacturing contract, and the contract itself, when taken in its entirety, can bear no other interpretation. Geo. Delker & Co. v. Hess Spring & Axle Co., 138 Fed. 647; Western Hardware Company v. Bancroft-Charnley Steel Co., 116 Fed. 176; Gardner v. Deeds & Hirsig, 4 L. R. A. 742; Hadley-Dean Glass Company v. Highland Glass Co., 143 Fed. 242; Chapman v. Railroad, 114 Mo. 542, 146 Mo. 481; Berthold v. Const. Co., 165 Mo. 280. (2) Defendant, under the contract, had the option of ordering all the asphalt provided for of any one grade, saving and excepting "B" grade, of which it was limited to 10% of the total amount, or from all of the grades, and it was defendant's duty to give to the plaintiff, from time to time, during the continuance of the contract, reasonable notice of the grades and amounts it desired, and there was no obligation resting on the plaintiff to manufacture the asphalt until it was so ordered. Ault v. Dustin, 100 Tenn. 366; George Delker & Co. v. Hess Spring & Axle Co., supra; Kingman & Company v. Western Mfg. Co., 92 Fed. 486. (3) (a) Defendant having failed to order the asphalt, plaintiff was not warranted in manufacturing it and throwing it on the market and thereby increasing, perhaps, the damages. And, if he had done so, such action would not be binding on defendant. Kingman Mfg. Co. v. Western Mfg. Co., 92 Fed. 486; Gardner v. Deeds & Hirsig, supra; Belle of Bourbon Co. v. Leffler, 84 N. Y. S. 385; Cameron v. White, 74 Wis. 425. (b) Nor was plaintiff

obligated to make other contracts for asphalt for the unexpired time. He had the right to make as few or as many other contracts as he saw fit whilst executing the contract with defendant, and he is entitled to the profits which he might have made on this particular contract. Crescent Mfg. Co. v. Nelson Mfg. Co., 100 Mo. 325. (4) Under all the authorities he was clearly entitled to compensation for the breach of defendant, and his compensation is to be measured by the profit he would have made if he had been permitted to complete the contract—the difference between the cost of manufacture and the contract price. Where a contract for the manufacture and delivery of goods is repudiated by the vendee before the goods are manufactured, the measure of the vendor's damages is the difference between the contract price and the cost of manufacture. Hadley-Dean Glass Co. v. Highland Glass Company, supra; Western Hardware Co. v. Bancroft-Charnley Steel Co., supra; Gardner v. Deeds & Hirsig, supra; Kingman v. Western Mfg. Co., supra; Black River Lumber Co. v. Warner, 93 Mo. 374; Crescent Mfg. Co. v. Nelson Mfg. Co., 100 Mo. 325; Hammond v. Beeson, 112 Mo. 198; Chapman v. Railroad, 146 Mo. 481; Berthold v. Const. Co., 165 Mo. 280; Roehm v. Horst, 178 U. S. 1; Beardsley v. Smith, 61 Ill. App. 340; and numerous cases cited in 4 L. R. A. at page 742, note; Hale v. Trout, 35 Cal. 229; Winaus v. Lumber Co., 66 Cal. 61.

*W. B. Homer* for respondent.

(1) "The general and just rule for measuring the damages for the breach of a contract for the sale of personal property is the difference between its market value and its contract price, because the vendor is presumed to have the property on hand; and his profits, if the contract is performed, and the loss if it is broken, is the difference between the price he can sell the property for in the market, and the price he is entitled

to receive under the contract." Rickey v. Ten Broeck, 63 Mo. 567; Halliday v. Lesh, 85 Mo. App. 289; Black River Lumber Co. v. Warner, 93 Mo. 374; Gaibout v. Clark, 24 Mo. App. 426; Campbell v. Woods, 122 Mo. App. 719; Parlin v. Boatman, 84 Mo. App. 67; Bank v. Ragsdale, 171 Mo. 168; Nelson v. Hirsch, 102 Mo. App. 498; Kingman v. Western Mfg. Co., 92 Fed. (C. C. A.) 486. (2) The purpose of pleading, when such pleading relates to a written document, is to make clear to the court the legal effect of such document. Anderson v. Gains, 156 Mo. 669; Hood v. Nicholson, 137 Mo. 414. (3) Where it is attempted to fix the damages of a failure to accept property sold as other than the difference between the market value and the agreed price upon the ground that there is no market value for the property, the burden rests on the plaintiff to show that there is no market value at the place of delivery. Masterton v. Mayor, 7 Hill 61; Todd v. Gamble, 21 N. Y. Supp. 739, 67 Hun 38. (4) Where it is claimed that a party is entitled to profits as part damages, it is necessary to set out such profits in the petition. Wilson v. Russler, 91 Mo. App. 281; Ridgeley v. Mooney, 16 Ind. App. 362, 45 N. E. 348; Tufts v. Bennett, 163 Mass. 398.

BURGESS, J.—Plaintiff brought suit to recover of the defendant six thousand dollars damages for breach of contract.

After alleging the incorporation of the defendant company under the laws of Missouri, with chief office and place of business in the city of St. Louis, the petition proceeds as follows:

"Plaintiff states further that on November 21, 1900, and at all times hereinafter mentioned, he was engaged in business in the city of Los Angeles, county of Los Angeles, State of California, under the commercial name, style and title of the Southern Refining

Company; that the business in which he was engaged under said name was that, among other things, of manufacturing, producing, dealing in and selling asphalt, and on said date he sold, and had for some time prior thereto been selling, to the defendant asphalt produced and manufactured by him under the name and style aforesaid.

"Plaintiff states further that on said 21st day of November, 1900, at the city of Los Angeles, State of California, plaintiff and defendant, by and through its agent, entered into a certain contract, hereinafter more specifically set forth, which said contract was made and delivered subject to the ratification thereof by defendant's board of directors, and was thereafter by said board of directors, on the 27th day of November, 1900, duly ratified, approved and accepted."

The petition then alleges "that by said contract, for and in consideration of the covenants and stipulations therein mentioned to be kept and performed by plaintiff and defendant, plaintiff agreed to sell and deliver to defendant, f. o. b. cars at plaintiff's factory in the city and county of Los Angeles, 1200 tons of asphalt, and defendant agreed to purchase and pay for said asphalt according to grade and prices hereinafter specifically set forth;" and further alleges "that it was agreed between plaintiff and defendant that said asphalt should consist of the following grades, sold and purchased at the following prices." Here follow five different grades of asphalt at certain prices per ton, which grades are described as "B", "C", "D", "DX" and "G". After certain other allegations which are unnecessary to be stated here, the petition proceeds:

"Plaintiff states that thereafter, and beginning with the month of January, 1901, he and defendant entered into the execution of said contract, and that at and during all the times in said contract mentioned plaintiff was able, ready and willing to perform, and did duly

perform all the conditions on his part in such contract covenanted and agreed therein by him to be performed, but that after so entering upon the execution of said contract defendant neglected, failed and refused to per- form the conditions on its part in said contract covenanted and agreed to be by it performed, and defendant neglected, failed and refused at and during the times in said contract specified therefor, or at all, to purchase and pay for the asphalt in said contract by it agreed to be purchased and paid for, any quantity in excess of three hundred and seventy-five and 1445-2000 tons, by reason whereof plaintiff has been damaged in the sum of six thousand dollars.

"Wherefore plaintiff prays judgment against defendant for said sum of six thousand dollars, together with interest thereon from the first day of January, 1902, and for his costs in this behalf expended."

The material parts of the contract introduced in evidence are as follows:

"That for and in consideration of the covenants and stipulations hereinafter mentioned to be kept and performed by the respective parties hereto, it is hereby agreed between said parties as follows:

"That first party [plaintiff] will sell and deliver to said second party [defendant] hereto, f. o. b. cars at first party's factory, in said city and county of Los Angeles, twelve hundred tons of asphalt, and that said second party will purchase and pay for same, said asphalt to be so delivered at the rate of one hundred tons of two thousand pounds each, gross weight, per month, or as near such rate as shipment in carload lots will permit. That said asphalt shall consist of the following grades, and be sold and purchased at the following prices, to-wit:

"B grade of asphalt cement, at $21.00 per ton;
C  ″  ″  ″  ″  ″  17.00  ″  ″
D  ″  ″  ″  ″  ″  15.50  ″  ″

DX  ''    ''       ''     ''      ''     15.50   ''   ''
G   ''    ''   liquid asphalt   ''    18.00   ''   ''

and be of first class quality and equal to the grades heretofore supplied by first party to second party, provided however, that in no event shall the proportion of 'B' grade of asphalt exceed ten per cent of the total amount of asphalt hereinbefore and hereinafter provided for, and that in making shipments, the said B grade of asphalt to be of no more than ten per cent of the total amount furnished and shipped in any one month. . . .

"It is further agreed that said second party instead of confining itself to said twelve hundred tons of asphalt per year, with rate of deliveries at one hundred tons per month, may have the privilege of purchasing on like terms, an additional twelve hundred tons per year, making a total purchase of twenty-four hundred tons per year, with total rates of delivery at two hundred tons per month; said privilege to be exercised by giving first party three months' written notice of its desire to take said twenty-four hundred tons of asphalt per year with deliveries at said rate of two hundred tons per month, and in case said second party so elects to take said twenty-four hundred tons per year, it shall do so for a full period of one year, notwithstanding this agreement would otherwise end if one hundred tons per month only were taken.

"It is further agreed that in case second party purchases said twenty-four hundred tons of asphalt per year, to be delivered at the rate of two hundred tons per month as aforesaid, then the prices which it shall pay therefor shall be as follows: [Prices omitted.]

"It is further agreed that in the event of said second party purchasing said twenty-four hundred tons of asphalt per year, that then during such time as it purchases and pays for the same in such quantities,

the first party will not sell any of said grades of as-phalt to any persons or parties for use in that territory of the United States lying east of the Rocky Mountains, it being the intention that so long as second party pur-chases twenty-four hundred tons per year from first party, deliveries thereof at the rate of two hundred tons per month, that the first party will not compete with it in said designated territory—it being stipulated and understood, however, that this provision shall be in force and effect only in case second party elects to purchase twenty-four hundred tons per year on or be-fore January 1, 1902.

"It is further agreed that this contract is made to cover sales, purchases and deliveries for the period of one year from January 1, 1901, with a privilege to said second party of a renewal of the same from year to year for a period of four years in addition— the election of said second party to so renew the same to be manifested by giving first party a written notice thereof at least forty days before the expiration of the year then current, in which this contract would otherwise end; and further provided, that the price at which first party is to sell, and which second party is to pay under such renewals, shall be based upon the cost of crude oil at said first party's factory at Los Angeles, of the quality and character used by first party in manufacturing said grades of asphalt, the same to be of clean, dry virgin oil of not less than eighteen degree gravity; in other words, the prices hereinabove fixed upon said grades of asphalt are based upon the price of said crude oil at $1.25 per barrel, but if during the time of any renewals of this contract, and in any event, upon the expiration of the first year, the market price of said crude oil should be $1.50 or above per barrel, f. o. b. cars at first party's factory, then there is to be during the time of such increased price a pro-portionate increase in the price of said grades of as-

phalt; and, on the other hand, if said market price of said crude oil f. o. b. cars at first party's factory shall be $1 or less per barrel, then during the time the same is at said price there shall be a proportionate decrease in the price of said grades of asphalt.''

It was admitted that the contract was ratified by the board of directors of the defendant company, that a part of the asphalt contracted for was taken and paid for by defendant, and that it did not accept or receive the balance.

The evidence showed that the plaintiff was a manufacturer of products of petroleum at Los Angeles, California, and was conducting his business, as an individual, under the name of the Southern Refining Company; that he first began to sell asphalt to defendant in June, 1900, the first shipment being made on June 13, 1900.

The evidence further showed that in its letter to plaintiff ratifying the contract, the defendant requested ''that you will give us, on the 1,200-tons basis per year, the exclusive sale of your goods in the States of Missouri, Illinois, Indiana, etc., . . . that you should give us the exclusive agency for the States named, as we shall commence to thoroughly cover this territory.''

Plaintiff testified that during the period covered by the contract in suit, he was at all times ready to furnish the amount of asphalt as stipulated and provided for in the agreement, and that the asphalt that he did furnish to the defendant, under said contract, was the same in quality as he had been making right along, and the same as that theretofore furnished by him to defendant, and that it was a first class quality of asphalt.

John J. Bacigalupi, on behalf of the plaintiff, testified that he had been in the oil and asphalt business several years, and had been in the employ of plaintiff,

as secretary and superintendent, at his refinery in Los Angeles since 1899; that he superintended the manufacture of asphalt, the purchasing of oils, shipping of products and the keeping of the books. He testified to the amount of shipments under the contract by the plaintiff to the defendant, and that there were about 824 tons, under the contract, which defendant had not taken of the goods described in the contract.

The following question was asked witness Bacigalupi: "Have you figured what the cost to Mr. Brown was of those various grades, placed f. o. b. cars, at Los Angeles?" An objection to this question was sustained, and the court made the following ruling:

"There is a way of establishing a market value of an article that has a market value without taking it to market and offering it for sale. You could recover damages without manufacturing a pound yourself. At the time the defendant notified you they would not accept the stuff, your damages became complete. You are entitled to receive the market price on the day or about the day—I would not limit you to a day or week, or probably a month, unless there was some violent fluctuation."

Plaintiff admitted that he had no evidence of the market value of this product, and offered no further evidence in the case.

At the request of the defendant, the court instructed the jury that under the pleadings and the evidence the plaintiff's recovery was limited to nominal damages, or the sum of one dollar.

Plaintiff took a nonsuit with leave to move to set it aside. Upon filing his motion for such purpose, it was overruled by the court, whereupon plaintiff appealed.

Plaintiff's first contention is that the contract for the breach of which this suit is prosecuted is a contract to manufacture. It is argued that the situation of the

parties, their previous dealings, the seeking by defendant to obtain the exclusive agency for certain territory for the sale of plaintiff's goods, and the fact that defendant knew that plaintiff was a manufacturer, all indicate that this contract was understood to be a manufacturing contract, and that the contract itself, when taken in its entirety, can bear no other interpretation. On the other hand, defendant insists that the contract is one of purchase and sale, and that the amount of damages assessable against it for the breach is the difference between the contract price and the market price of the asphalt contracted for and which it failed to take.

The contract, upon its face, is clearly one of purchase and sale; and the petition alleges that on the 21st day of November, 1900, "he [plaintiff] *sold,* and had for some time prior thereto *been selling,* to the defendant asphalt produced and manufactured by him under the name and style aforesaid;" and that "defendant neglected, failed and refused at and during the times in said contract specified therefor, or at all, to *purchase* and pay for the asphalt in said contract by it agreed to be *purchased* and paid for." There is no allegation in the petition to the effect that the asphalt contracted for was to be manufactured by the plaintiff, or that it had been manufactured by him, for the defendant; nor is there anything in the contract to that effect. The contract says, "that first party [plaintiff] will sell and deliver to said second party [defendant] hereto, f. o. b. cars at first party's factory, in said city and county of Los Angeles, 1,200 tons of asphalt, and that said second party will purchase and pay for same. . . . It is further agreed that said second party instead of confining itself to said twelve hundred tons of asphalt per year, with rate of deliveries at one hundred tons per month, may have the privilege of purchasing on like terms an additional twelve hundred tons per year.

. . . It is further agreed that in the event of said second party purchasing said twenty-four hundred tons of asphalt per year, then during such time as it purchases and pays," etc.

When the contract is considered as a whole, it is not ambiguous.

The Western Hardware Co. v. Bancroft-Charnley Steel Co., 116 Fed. 176, was a suit for damages for the breach of three certain contracts in writing, by the terms of which the Bancroft-Charnley Steel Company agreed to sell and the Western Hardware Mfg. Co. of Milwaukee agreed to buy certain articles therein named, and at the prices agreed upon. The making of the contracts and the failure to deliver were admitted, but the defendant in error alleged as a defense, under certain provisions of the contracts, the destruction of its mill by fire in Chicago, where it was contemplated by the contracts the iron should be manufactured. The contracts contained a provision that defendant should not be liable for any loss or damage arising from non-fulfillment by reason of fire, strikes, etc., and a further and separate provision that "the sellers are permitted, if they desire, to transfer this contract to any manufacturers of reputable standing." Defendant was the owner of an iron-mill, and its business was the manufacture of iron such as that covered by the contracts. Held, that the contracts were to be construed with reference to such known facts, and were contracts for the manufacture and sale of goods, and not merely of bargain and sale; that, on the destruction of defendant's mill by fire before the contracts had been fully performed, it was absolved under their terms from further performance, and was not required to purchase the iron elsewhere, or to transfer the contracts.

It is true that the contract in that case did use the words "buy and sell," but all other provisions of the contract showed that it was the intention of the

parties that the goods should be manufactured in accordance with specific directions of the purchaser. The seller in that case was engaged solely in the manufacturing business, and was not engaged in the business of buying and selling iron. It had no place for such business. The contract provided that in case of "being prevented by fire, strikes and manufacturing contingencies, the seller should not be liable upon the contract," and the court so held.

The case of George Delker Co. v. Hess Spring & Axle Co., 138 Fed. 647, is of much the same character, the Hess Spring & Axle Co. of Carthage, Ohio, agreeing to sell and George Delker Co., of Henderson, Kentucky, agreeing to buy a quantity of steel axles and springs at the prices and upon the terms and conditions stated in the contract. It was also provided in the contract that the manufacturer should purchase certain specified material to be used in the manufacture of the goods, and that he should not be liable upon his contract in case of strikes. The court in effect held, and properly so, that the contract was for the sale and purchase of articles to be manufactured.

In the case of Hadley-Dean Plate Glass Co. v. Highland Glass Co., 143 Fed. 242, the Highland Glass Company, a Pennsylvania corporation, engaged in the manufacture of glass in that State, received and accepted from the plaintiff, a Missouri corporation, carrying on the business of a jobber and dealer in glass at St. Louis, an order for the manufacture and delivery of glass of certain description. The order was "Book us with;" then followed a description of the glass. There was no question raised as to the character of the contract, that is, whether it was one of purchase and sale or a manufacturing contract; but the court held that it was intended by the parties thereto as a contract to manufacture the goods which were to be booked.

There was no discussion of this question in the

case of Chapman v. Railroad, 114 Mo. 542, Chapman v. Railroad, 146 Mo. 481, or Berthold v. Construction Co., 165 Mo. 280; nor was such question passed upon.

In this case there is no evidence as to whether or not the plaintiff had the goods on hand at his factory to be delivered to defendant, f. o. b., at the times stated in the contract. It is true, plaintiff testified that during the period covered by the contract, he was at all times ready to furnish the amount of asphalt as stipulated and provided for in the agreement, but this by no means shows whether he had the material on hand, or whether he was depending upon going into the markets and purchasing it.

The contract being one for the purchase and sale of the asphalt, and the defendant having admitted its failure to comply with the terms of the contract, the question is as to the measure of damages. When a vendor sues the vendee for the non-acceptance of property sold or contracted for, the measure of damages is the difference between the contract price and the market value of the property at the time and place of delivery. [Rickey v. Tenbroeck, 63 Mo. 563; Black River Lumber Co. v. Warner, 93 Mo. 374; Northrup v. Cook, 39 Mo. 208; Koeltz v. Bleckman, 46 Mo. 320; Warren v. Mayer Mfg. Co., 161 Mo. 112; Parlin & Orendorff Co. v. Boatman, 84 Mo. App. 67; Halliday & Co. v. Lesh, 85 Mo. App. 285.] In a contract for the sale of property the presumption is that the vendor has the property on hand, and as there is no evidence to the contrary in this case, the presumption is that the plaintiff had the property ready to deliver, and the defendant having refused to accept the property according to the terms of his contract, plaintiff is entitled to recover as damages the difference between the contract price and the market price, if any, of his goods.

The case of Kingman & Co. v. Western Mfg. Co., 92 Fed. 486, relied upon by plaintiff, announces the

210 Sup—18

law as to the measure of damages in case of sale and non-acceptance of personal property as follows: "The general and just rule for measuring the damages for the breach of a contract for the sale of personal property is the difference between its market value and its contract price, because the vendor is presumed to have the property on hand; and his profits if the contract is performed, and his loss if it is broken, is the exact difference between the price he can sell the property for in the market and the price he is entitled to receive for it under the contract."

It devolved upon the plaintiff to prove his damages by the introduction of evidence of the market value of the asphalt at the place of sale and delivery, and having failed in this, he is not entitled to recover anything more than nominal damages, unless he expects to recover damages upon some other theory, in which event it rests upon him to show that there was no market value.

In Masterson v. Mayor, etc., 7 Hill 61, it was held that when one party to an executory contract puts an end to it (as did the defendant in the case at bar), by refusing to fulfill it, the other party is entitled to an equivalent in damages for gains or profits which he would have realized if the contract had been performed. The court said: "The only difficulty or embarrassment in applying the general rule grows out of the fact that the article in question does not appear to have any well-ascertained market value. But this cannot change the principle which must govern, but only the mode of ascertaining the actual value of the article, or rather the cost to the party producing it. Where the article has no market value, an investigation into the constituent elements of the cost to the party who has contracted to furnish it becomes necessary, and that, compared with the contract price, will afford the measure of damages."

Later on, in the same case, it is said: "If there was a market value of the article in this case, the question would be a simple one. As there is none, however, the parties will be obliged to go into an inquiry as to the actual cost of furnishing the articles at the place of delivery; and the court and jury should see that in estimating this amount it be made upon a substantial basis, and not left to rest upon the loose and speculative opinion of witnesses."

As there was no evidence of the market value of the asphalt at the place of delivery, nor of the actual cost of furnishing it at that place, the court had no substantial basis upon which to estimate the damages, but was left to mere conjecture with respect thereto. Under the pleadings and evidence, plaintiff was only entitled to recover nominal damages, and the court did not err in so holding.

The judgment is affirmed. All concur.