# WILLIAM L. SEELIG, Appellant, v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY.

### Division One, April 9, 1921.

1. **INSTRUCTIONS: Duplications.** If instructions offered by opposing parties are counterparts of each other, it is not necessary to give both. If one be given it will sufficiently present the opposing theories of the case.

2. ————: **Railroad Consolidation: Assumption of Debt.** Where one corporation was merged into another by consolidation, the merged company transferring to the other all its property except its franchise to be a corporation and going entirely out of business, and the other assuming to pay all its debts, in an action against the surviving corporation to recover for services rendered in relation to the affairs of the merged corporation, if the only evidence of the value of the services covers the entire period, and nothing shows separately the value of those rendered before the consolidation, there is no basis for an instruction authorizing recovery; the assumptions of debt did not cover the after-rendered services.

3. ————: **Nominal Damages.** Where there is no evidence from which the value of services for which suit is brought can be estimated, the plaintiff is not entitled to recover more than nominal damages.

4. **NOMINAL DAMAGES: Definition.** By nominal damages is meant those awarded where, from the nature of the case, some injury has been done, the amount of which the proofs fail entirely to show; or, differently expressed, a trifling sum awarded where a breach of duty or an infraction of the plaintiff's right is shown, but no serious loss is proved to have been sustained.

5. **EVIDENCE: Relevancy.** It is not error to exclude evidence which is not relevant to the issues in the case.

6. ————: **Colloquy.** Where the matter excluded consisted partly of testimony but mainly of colloquy between counsel, the court and the witness, looking toward an adjournment of the case in order to enable the witness, offered as an expert, to inspect certain books and give an opinion based on such inspection, the matter was not responsive to any question, and it was not error to exclude it.

7. **CONTINUANCE.** The granting and refusing of continuances is largely a matter of the discretion of the trial court, and unless a clear abuse of its discretion is shown its action will not be interfered with.

8. **HYPOTHETICAL QUESTION: All Material Facts.** A hypothetical question which does not embody substantially all the material facts relating to the subject upon which the opinion of the witness is sought is objectionable and should be excluded.

9. **JUDICIAL KNOWLEDGE: Value of Services.** The employment of an auditor of a railroad construction company is not such a common thing, and the reasonable value of the services that may be performed by such an official is not so within the common knowledge of all men, that courts and juries may be presumed to know their value without proof.·

Appeal from St. Louis City Circuit Court.—*Hon. William T. Jones,* Judge.

AFFIRMED.

*Joseph H. Grand* and *Fred H. Wulfing* for appellant.

*J. W. Jamison* for respondent.

ELDER, J.—This is an action for the recovery of the value of services rendered by plaintiff (appellant herein), as auditor of the Missouri Kansas & Oklahoma Railroad Company.

The petition alleges that on June 14, 1904, plaintiff was employed as auditor of the said company, entered upon his duties as such, and performed all of those duties up to June, 1912; that said railroad company agreed to pay plaintiff for the reasonable value of the services rendered by him as such auditor, and that the same were reasonably worth, in all, the sum of $7500; that on the —— day of ——, 19—, defendant Missouri, Kansas & Texas Railway Company took possession of and now holds all of the assets of said Missouri, Kansas & Oklahoma Railroad Company, and that "said Missouri, Kansas & Texas Railway Company, at or about said date expressly assumed in writing, and agreed to pay all of the debts of said Missouri, Kansas & Oklahoma Railroad Company, including the debt due to plaintiff from said Missouri, Kansas & Oklahoma Railroad Company, as aforesaid." Judgment is prayed for $7500, with interest thereon at the rate of six per cent per annum from the —— day of June, 1912. The suit originally was brought against the Missouri Kansas & Oklahoma Railroad Company and the defendant Missouri, Kansas & Texas Railway Company, but was later dismissed as to the former company.

The answer was a general denial.

Judgment was rendered for plaintiff for nominal damages of one cent. From this judgment, after an unsuccessful motion for a new trial, plaintiff took an appeal to the St. Louis Court of Appeals. For want of jurisdiction, owing to the amount involved, the St. Louis Court of Appeals ordered the case transferred to this court and it now comes on for review.

The following statements of fact, set forth in appellant's statement and brief, are admitted by respondent:

"The undisputed testimony shows that plaintiff on and prior to the 14th day of June, 1904, was and had been in the employ of the defendant, M., K. & T. Railway Company, as general auditor, and that on that day was appointed auditor of the M., K. & O. Railroad Company, said appointment being made by a Mr. Hedge, vice-president of that corporation.

"It also stands undisputed that the M., K. & O. Railroad Company was a construction company whose officers and directors were also officers and directors of the defendant, M., K. & T. Railway Company; that on the 30th day of June, 1904, a preliminary deed was made, and subsequently on November 3, 1904, a final deed was made by the M., K. & O. Railroad Company, said deed conveying all of its property and assets and all of its rights, privileges and franchises, excepting the right and franchise to be a corporation, to the defendant company for the consideration of $1 and the payment by the defendant of all 'debts, demands, claims and liens' of the M., K. & O. Company, which the defendant assumed and agreed to pay, satisfy and discharge."

Plaintiff did not personally appear or testify at the trial of the case, but his deposition was read in evidence. His testimony was that he entered the service of the defendant Missouri, Kansas & Texas Railway Company in 1892, and remained with that company, serving in several capacities, until October, 1912; that during about the last eight years he was auditor of the company, his salary being $7500 per annum; that immediately upon his appointment as auditor of the Missouri, Kansas &

Oklahoma Railroad Company, on June 14, 1904, he "took charge of all of the books of the corporation, entered negotiations with contractors, inventoried the property, made collections of accounts, and settlements, auditing also all of the files of record, for the reason that the business of the company was involved;" that the nature of services rendered by him was "the work of an expert, going over the work for a period of two years, and to conclude the construction accounting and to liquidate the construction company;" that "the services were concluded in 1912, at which time I was advised that no further effort should be made to collect the bonus notes, as they were not considered worthy of further attention, under the conditions which had been indicated by the efforts to collect each of the notes;" that the service was continuous, "requiring much additional work at nighttime and outside of regular duties which I performed for the Missouri, Kansas & Texas Railway Company;" that during all the time the books and accounts were "kept in the office of the Missouri, Kansas & Texas Railway Company," but were kept separately; that some of the records were involved and required a great deal of time to decipher as they "were kept without regard to an experienced system of accounting;" that he had frequent conferences with the officers of the defendant company in reference to the accounts. Upon being asked to state "the fair and reasonable value of the services that you performed as auditor of the Missouri, Kansas & Oklahoma Railroad Company," plaintiff replied, "The most conservative estimate that I have is $7500."

On cross-examination plaintiff testified:

"Q. You know, do you not, that after the completion of these conveyances, all of the property of the Missouri Kansas & Oklahoma Railroad Co. was turned over to the Missouri, Kansas & Texas Railroad Company? A. Well, it conveyed its property, yes.

"Q. And all property, of every kind, and franchises, of the Missouri, Kansas & Oklahoma, was conveyed to the Missouri, Kansas & Texas Company? A. There was the conveyance, yes. . . .

"Q. And you left the service of the Missouri, Kansas & Texas Railroad Company in June, 1912? A. Yes, actually it was October 1st, 1912.

"Q. Who was the comptroller of the company at that time? A. Mr. Geo. T. Cutts.

"Q. How long had he been there? A. About a year.

"Q. Did you ever present him with a claim or an account for your services? A. He was not interested in that.

"Q. Ask any other officer or agent of the company prior to the time of the institution of this suit? A. Yes sir, I filed a claim for services, by correspondence.

"Q. With whom did you correspond? A. General Solicitor, Mr. J. M. Bryson.

"Q. When? A. In 1912.

"Q. Did you write to Mr. Bryson? A. Yes, about the claim.

"Q. What reply did you get? A. I don't remember now.

"Q. Did you receive any letter from Mr. Bryson? A. I might have received an acknowledgment.

"Q. Did you correspond with anybody else in connection with the railroad at any time about this claim, make any claim to anybody else prior to your correspondence with Mr. Bryson? A. I don't remember.

"Q. When was it you took up this correspondence with Mr. Bryson, after you severed your connection with the company? A. Yes, sir." During the course of the trial the court sustained objections by counsel for defendant to the following testimony contained in the deposition of plaintiff:

"Q. Will you give, in order, the services, fixing the amount of work that you did in connection with the audit of the accounts of the company; will you give a general estimate of that work? A. The Missouri, Kansas and Oklahoma Railroad Company, which is the combination of the Texas and Oklahoma Railroad, being a line from Oklahoma City to Colgate, of 117 miles and a

fraction, and the Missouri, Kansas and Oklahoma Railroad, was bonded for $5,468,000, and the Texas and Oklahoma for $2,347,000, and a first mortgage extension of $337,000, and a total mortgage of $8,152,000—and capital stock of $7,200,000, total capitalization of $15,352,-000. The bonds were issued in units, covering ten miles of railroad, and were guaranteed by the Missouri, Kansas and Texas Railway Company.

"MR. JAMISON: Objected to as stating a conclusion of witness.

"Q. Go ahead. A. The extension mortgage bond covering the lease of the line, instead of construction, from Atocka, to Colgate, a total of 13.6 miles. These bonds were exchanged for the first and refunding mortgage bonds of the Missouri, Kansas and Texas Railway Company, in the amount of $421,000, and the proceeds retained by the officers and directors of the Missouri, Kansas and Oklahoma Railroad Company, for services. The capital stock of $7,200,000 was exchanged for common stock of the Missouri, Kansas and Texas Railway Company, and $2,200,000 retained by the officers and directors for services; $5,000,000 was sold to the Southwestern Development Company at 15. The Southwestern Development Company was the successor to the Southwestern Coal & Improvement Company, which had a capitalization of $2,800,000, all owned by the Missouri, Kansas & Texas Railway Company, and carried on its books at a value of $280,000. No dividends had been received until 1903, when a four per cent dividend of $11,200 was received by the Missouri, Kansas & Texas Railway Company from its mining operations. In 1903 the Southwestern Coal & Mining Company was reorganized and known as the Southwestern Development Company, and capitalized at $1,000,000, 53.37% of the stock being taken by the officers and directors of the Missouri, Kansas & Texas Railway Company, as compensation, the Missouri, Kansas & Texas Railway Company receiving 46.67% of the million dollar capitalization. In the early part of 1903 the construction of the

Missouri, Kansas & Oklahoma Railroad, and the Texas
& Oklahoma Railroad was contemplated, and the South-
western Development Company borrowed $200,000 from
the Missouri, Kansas & Texas Railway Company, which
was later repaid.

"MR. JAMISON: Objected to, as it does not show any
attempt, or employment if any.

"A.   The Missouri, Kansas & Texas Railway agreed
to accept the line as constructed, in ten-mile sections.

"MR. JAMISON: Objected to for the reason that it
is a conclusion of the witness—was that agreement in
writing?

"A.   I don't know as to that.   The books that I
audited would show.

"Q.   The books that you audited would show the
entire transaction?   A.   Yes, sir.

"Q.   Go ahead.   A.   These bonds were issued at
ninety, and the cost of construction and improvement
limited to the sale of the bonds to the Southwestern De-
velopment Company at ninety.   The Southwestern De-
velopment Company sold these bonds at an average of
110, making a net profit to the Southwestern Develop-
ment Company of $1,563,000, of which amount the offi-
cers and directors received 53.34%.

Q.   Which company do you mean?   A.   The offi-
cers and directors of the Missouri, Kansas & Oklahoma
Railroad Company, who were the same officers and di-
rectors as of the Missouri, Kansas & Texas Railway
Company.   The $5,000,000 of common stock of the Mis-
souri, Kansas & Texas Railway Company was sold to the
Southwestern Development Company at 15.

"Q.   At $15 per share?   A.   Yes, sir—the Missouri,
Kansas & Texas Railway Company receiving from the
Southwestern Development Company $750,000 therefor.
This stock was later sold at an average of 40, a market
having been made, thus a net profit made of about
$1,250,000, of which the officers and directors received
53.34%.

"Q. What officers do you mean? A. The officers and directors of the Missouri, Kansas & Oklahoma Railroad Company, who were the same officers as the officers and directors of the Missouri, Kansas & Texas Railway Company, all the way through. The $2,200,000 of stock was sold by the officers and directors of the Missouri, Kansas & Texas Railway Company, about that time. The Missouri, Kansas & Oklahoma Railroad and the Texas & Oklahoma Railway were built through virgin country, and town sites and rights of way and privileges and free rights of way were considerations. No portion of the proceeds of bonuses, or town site propositions, were used in the construction of the Texas & Oklahoma Railroad, or the Missouri, Kansas & Oklahoma Railway, but all of which were received by the officers and directors of the Missouri, Kansas & Oklahoma Railroad, and the Texas & Oklahoma Railway, who were the same as the officers and directors of the Missouri, Kansas & Texas Railway. The balance of the bonus notes, of which there were a great many, were turned over by the construction company to the Missouri, Kansas & Texas Railway Company, at the final completion; and thereafter, all matters pertaining to the collections were made for account of the Missouri, Kansas & Oklahoma Railroad, which extended up to a number of years. There were many notes which were contested, by reason of the failure to carry out obligations on the part of the railway. The Southwestern Development Company finally liquidated in 1906, and the Missouri, Kansas & Texas Railway Company paid for the mining rights, etc., $187,000 which they originally owned—in order that the Southwestern Development Company might pay a 100% dividend.

"Q. Cash dividend you mean? A. Yes, dividend on the stock, when it was finally liquidated. The president of the Southwestern Development Company was a clerk of the office of the president of the Missouri, Kansas & Texas Railway Company.

"Q. What was his name? A. I cannot recollect his name.

"Q. Whose office? A. The office was located at 49 Wall Street."

Harry G. Ambrose, a certified public accountant, testified for plaintiff that "around 15 or 20 years ago" he had had experience in auditing accounts of a construction company constructing a railroad and was familiar with that class of accounts. Being present in court and having heard the deposition of plaintiff read the witness was asked: "From what you heard read there, can you in your mind, approximate anything like the amount of time that is necessary to do that work?" He answered, "I think so." On being interrogated further, witness was asked: "Would you say from what you heard here, that he put in one or two hours a day?" Witness replied: "Assuming he put in one or two hours a day, the reasonable value would be a certain amount."

THE COURT: "That is the trouble, he is assuming something of which we have no evidence. I think I will have to sustain the objection."

The following further questions aimed to elicit an opinion as to the reasonable value of the services performed by plaintiff were excluded by the court:

"MR. GARESCHE: Mr. Ambrose, it may take you a little time and it may take a little of the court's and the jury's time, but I will ask you to examine these records here? Just go over then and tell the court and jury approximately how much time it would take to audit these accounts here as they appear in these books (Handing books to witness).

"MR. JAMISON: I want to object, your Honor.

"THE COURT: Let's see if he can, first.

"MR. JAMISON: I went to make the objection to begin with, that not a single line or mark in these books was made by Mr. Seelig, and there is no entry in these books showing any transaction after the date of the transfer by this deed that has been read in evidence, to the Missouri, Kansas & Texas Railway Company, and therefore, they don't show any work performed by Mr. Seelig.

"MR. GARESCHE: Counsel overlooks the fact that Mr. Seelig was not simply a bookkeeper, but he was an auditor, and the duties of an auditor, nobody knows better than counsel himself, do not consist of writing 'two and two are four,' but it consists, as a rule, in going over the accounts which have been kept by some one else, and determining every inaccuracy. Now, the witness Seelig did say he did this work; that he went over them all.

"THE COURT: Well, let me ask the witness.

"THE COURT: You heard the deposition of Mr. Seelig in reference to these books, that he made no entries in these books?

"THE WITNESS: I did.

"THE COURT: Now, can you, by looking through these books this way, form any definite idea as to the amount of work that Mr. Seelig, as an auditor, was required to do?

"THE WITNESS: I believe I could, if sufficient time were had; I frequently examine books, with a view of furnishing an estimate as to the time used, and we can in that way arrive at an estimate of the cost.

"THE COURT: How is that?

"THE WITNESS: I say, I frequently examine books with a view of furnishing the cost of the work, but that can't be done in a few minutes. We may spend several hours; we may spend half a day or a day, according to the size of the proposition, but I would have to have time to look at these books to make any estimate of time it would require to audit them.

"MR. GARESCHE: Do you think, between now and to-morrow morning at ten o'clock, you could look over these books and tell just how much time Mr. Seelig used in auditing these books? A. I believe I could, if you gave me sufficient time.

"THE COURT: Well, he said between now and to-morrow morning.

"MR. GARESCHE: You may have the time between now and to-morrow morning at ten o'clock, with the court's consent.

" Mr. Jamison :   I certainly, your Honor,· object to that.   Yesterday morning, you had this case adjourned over until to-day.

" Mr. Garesche :   Not a record was in court yesterday morning.

" Mr. Jamison :   The records were here.

" Mr. Garesche :   Not a record was in this court yesterday ˙morning.   They were brought in to-day.

" Mr. Jamison :   They have been ready and available.

" Mr. Garesche :   I asked you to let me inspect them not over ten days ago.

" Mr. Jamison :   There is not a mark in that man's handwriting in these books to show he ever had then in his hands, and he can't look at them now, and by some ⸲sort of semi-subconscious method of procedure—

" Mr. Garesche :   I object to the statement of counsel before the jury.   It is apparently intended to prejudice the rights of the plaintiff before this jury, and is plainly intended to minimize the importance of the witness before this jury.   I ask, your Honor, in view of ˌthe witness's last answer, that the hearing of this case be adjourned until to-morrow morning at ten o'clock, inasmuch as Brother Jamison puts us to that trouble, in order that this witness may examine these accounts.

" Mr. Jamison :   I object to the adjournment, your Honor.

" The Court :   The objection will have to be sustained."   .   .   .

" Mr. Garesche :   Now, Mr. Ambrose, don't answer ·promptly, because Mr. Jamison will want to object to this next answer, too, I suppose.   Assuming that it was ˌa line of railroad, say 237 miles in length, under construction, what would you say would be the fair and reasonable value of the services of an auditor or expert public accountant in auditing the accounts of that railroad, or that corporation building that line of railroad, per annum?

" Mr. Jamison :   I object to that, as it is a hypoˌthetical question that is not based on this case.   It de-

287  Mo.—23

pends upon how many contractors and sub-contractors there are, and innumerable other conditions that would be impossible to mention or even to conceive of. It don't pretend to show what was done in this case."

For defendant, Charles S. Burg, commerce counsel of the Missouri, Kansas & Texas Railway Company, testified that in 1904 he was chief clerk of the law department under Mr. Hagerman and Mr. Bryson, general and assistant general counsel, respectively; that he was acquainted with plaintiff who, at that time, was general auditor for the defendant company; that R. W. Maguire, the comptroller of the company, was plaintiff's superior; that the collection of all bonus notes that were transferred by the M., K. & O. to the M., K. & T. in 1904 had been handled by the law department; that they were turned over to the law department by Mr. Maguire, comptroller of the M., K. & T. Railway Company, to be collected; that the notes remained in the law department for several years; that suits were instituted on some of the notes and compromises effected on others; that all correspondence concerning the notes was handled by the witness and Mr. Bryson; that as far as he knew, plaintiff never consulted the law department with reference to the notes; and that the correspondence of the law department concerning the bonus notes and their collection was with comptroller Maguire.

W. H. Brown, a witness for defendant, testified that in 1904 he was stenographer for both plaintiff and Maguire, auditor and comptroller, respectively, of the Missouri, Kansas & Texas Railway Company; that he saw the books of the M., K. & O. Railroad Company in the office; that he could not recollect writing any letters for plaintiff with reference to the M., K. & O. Railroad Company's bonus notes; that Maguire dictated all letters and attended to the business of that company; that he saw the books of the M., K. & O. in the hands of plaintiff only once and on that occasion Maguire and Seelig were looking over the books; that he often worked nights and Sundays between December, 1904, and July, 1906, and never

saw Mr. Seelig working on any books when he was there;
that there were two sets of books, one labeled M. K. &
T., and the other M. K. & O. On redirect examination
witness stated that, as far as he knew, plaintiff dictated
no letters with reference to bonus notes.

Charles Nelson Whitehead, testifying as a witness
for defendant, stated that he had been associated with
the defendant for a period of twenty-five years; that he
started in Dallas, Texas, as a messenger in a local yard
office and was promoted to higher positions until he be-
came vice-president, and at this time assistant to the
receiver; that in 1904, he was in the office of the general
counsel in St. Louis; that he knew plaintiff well; that
he was quite familiar with the transaction through which
the M., K. & T. Railway Company acquired the property
of the M., K. & O. R. R. Company, which transaction
took place in the office of the general counsel, and that
he went to New York in 1905 to take charge of all the
books and records pertaining to the transaction; that
some of the books of the M., K. & O. were in New York
and some in St. Louis; that Mr. Maguire was appointed
comptroller of the M., K. & O. at the same time that
plaintiff was appointed auditor and that he continued
his services as such until 1909 or 1910; that the Missouri,
Kansas & Oklahoma Railroad Company "went out of
existence after the time of its consolidation;" that it
"never transacted any business of any kind; paid no
taxes or never performed any functions of an active
company from the time of its sale to the M., K. & T.
on June 30th, 1904. It still has a charter, and so far
as any officers of the company are concerned, they have
never resigned and they are still officers of that com-
pany if there be one." In 1904, witness stated, the M.,
K. & O. sold its property to the M., K. & T., the con-
sideration for the sale was that the M., K. & T. would
assume all outstanding bonds of the M., K. & O., would
pay all of its outstanding liabilities and take all
of its assets; that the liabilities were practically
all paid at the time and the assets practically all col-

lected except a few outstanding bonus notes and probably a few construction accounts in which there were about forty or fifty thousand dollars involved. Witness stated that on June 30, 1904, all the assets and liabilities of the M., K. & O. became the assets and liabilities of the M., K. & T.; that the M., K. & O. only constructed but never operated a railroad and that after June 30, 1904, the property of the M., K. & O. from an operating and business standpoint was handled as the property of the M., K. & T. by the officers of the latter company, and that Mr. Maguire never demanded nor received compensation for work done in bringing over the assets of the M., K. & O. business. Witness stated that no one connected with the auditing department, comptroller's department, treasurer's and operating department ever received extra compensation for services rendered in connection with taking over the M., K. & O. and that no one except plaintiff ever demanded extra compensation, and that plaintiff made his demand after he was discharged. On cross-examination witness stated that there was no company operating under the charter of the M., K. & O. R. R. after October, 1904; that he did not know whether the M., K. & O. officers had any meetings after that date, but if there were meetings there were no minutes of them; that he did not know when the books of the M., K. & O. were finally closed and did not know what work plaintiff did on the books, but that if he did any, it was for the M., K. & T; that plaintiff was not discharged as auditor of the M. & K. O., because that company was considered out of existence after June 30, 1904; and that no officer received compensation for services to the M., K & O after June 30, 1904. On recross-examination witness stated that he did not examine the records, but that it was never brought to his attention that any officer demanded or received extra pay for services to the M., K. & O. after June 30, 1904. On second redirect examination, Mr. Whitehead further testified:

"Q. Mr. Whitehead, plaintiff's counsel just read there a question and answer by Mr. Seelig. His answer

was: 'The officers of the Missouri, Kansas & Texas Railway Company were also officers of the Missouri, Kansas & Oklahoma Railroad Company and received compensation as such.' Now, it is true, as I understand, that at the time and during this work of construction, some of the officers were the same; is that right? A. Yes, sir.

"Q. And while they occupied those positions and were in the active work of both companies, they did get salaries, some of them? A. Yes, sir.

"Q. State whether or not that was continued or was abandoned after June, when this consolidation took place. A. That was abandoned in June, the date of the deed."

E. F. Broomhall, testifying as a witness for defendant, stated that he was a resident of Parsons, Kansas, was connected with the Missouri, Kansas & Texas for about twelve and a half years, and that between 1907 and 1910 he was the general bookkeeper of the company in St. Louis, and knew plaintiff; that he had no knowledge of the Missouri, Kansas & Oklahoma books, but that he kept all of the books of the Missouri, Kansas & Texas and prepared and superintended all of the entries on the books of the company on the Missouri, Kansas & Texas Railway Company's books; that he brought the books that were introduced as the Missouri, Kansas & Oklahoma records and that the books had been in the custody of the Missouri, Kansas & Texas in the Railway Exchange Building and had been shipped there from his office in Parsons, where all the records of the company were stored; that he knew the handwriting of the plaintiff and that there was not a figure in the records that he could recognize as plaintiff's handwriting. On redirect examination he stated that the books produced, taken as a whole, were complete from a bookkeeping standpoint and kept in the usual and ordinary way; that the books and vouchers were brought because plaintiff through his counsel requested that they be produced. On recross-examination witness stated that the accounts in

the books were shown only to November, 1904, and did not know where the accounts after that date were and never heard of them. On second re-direct examination witness stated that if there were any accounts of the M., K. & O. kept after November, 1904, they were kept by the M., K. & T. Ry. Co. On recross-examination Mr. Broomhall stated that he did not of his own knowledge know what accounts were kept by the M., K. & O.

In rebuttal, a portion of plaintiff's deposition was read wherein plaintiff testified that "the officers of the Missouri, Kansas & Texas Railway Company were also officers of the Missouri, Kansas & Oklahoma Railroad Company, and received compensation as such."

The foregoing was substantially all the evidence in the case.

At the close of all the testimony, the court, at the request of defendant, gave the following instructions:

"2. If the jury find from the evidence that the services, if any, rendered by plaintiff in connection with the books, records or business of the Missouri, Kansas and Oklahoma Railway Company were performed by him as an employee of the Missouri, Kansas and Texas Railway Company and as a part of his duties as such employee then your verdict will be for defendant.

"3. The jury are instructed that if you find the issues for plaintiff you cannot under the law and the evidence allow him any sum in excess of what you may find from the evidence was the reasonable value of his services as auditor of the Missouri, Kansas and Oklahoma Railroad Company from the 14th day of June, 1904, to the 3rd day of November, 1904, and if under the evidence you are unable to determine the value of such services your verdict, if you find for the plaintiff, will be for nominal damages only or one cent."

On its own motion, the court gave the following instruction:

"4. The court instructs the jury that if you find and believe from the evidence that on or about the 14th day of June, 1904, the plaintiff was appointed auditor

of the Missouri, Kansas and Oklahoma Railroad Company, and that thereafter he rendered services and performed duties as such, then the plaintiff had, on November 3, 1904, a claim against said Missouri, Kansas and Oklahoma Railroad Company, for the reasonable value of the services so performed by him (if any), unless you further find that in the circumstances under which said appointment was made and said services (if any) were rendered, the plaintiff understood and knew that he was not expected to make any separate charge for his services so rendered (if any), and understood and knew that the Missouri, Kansas and Oklahoma Railroad Company did not expect to pay him for any services so rendered (if any).

"If you find, under the foregoing paragraph of this instruction, that the plaintiff had a claim against the Missouri, Kansas & Oklahoma Railroad Company on November 3, 1904, for services rendered by him as auditor of that company, and if you further find that on on said 3rd day of November, 1904, the said Missouri, Kansas & Oklahoma Railroad Company transferred and assigned all of its assets and properties, franchise, etc., to the defendant, M., K. & T. Ry. Co., and that as part of the consideration for said transfer, the M., K. & T. Ry. Co. assumed and agreed to pay all of the debts and claims of the said Missouri, Kansas & Oklahoma Railway Company, then you will find your verdict for the plaintiff and against the defendant Missouri, Kansas and Texas Railway Company for such sum as you may believe and find from the evidence is the reasonable value of the services performed by the plaintiff (if any) as auditor of the said Missouri, Kansas & Oklahoma Railroad Company, between the 14th day of June, 1904, and the 3rd day of November, 1904."

The court refused to give plaintiff's requested instruction as follows:

"1.   The court instructs the jury that if you believe and find from the evidence that heretofore to-wit, on or about the —— day of June, 1904, plaintiff was employed

by defendant Missouri, Kansas & Oklahoma Railroad Company as auditor and that thereafter and up to and inclusive of the —— day of June, 1912, plaintiff performed all the duties as auditor of said defendant, and if you further believe and find that defendant Missouri, Kansas & Texas Railway Company had conveyed to it all of the property of the defendant Missouri, Kansas & Oklahoma Railroad Company, and in and by the deed of conveyance defendant Missouri, Kansas & Texas Railway Company in consideration of said conveyance assumed and agreed to pay all the claims and contracts of defendant Missouri, Kansas & Oklahoma Railroad Company, then your verdict will be in favor of plaintiff and against the defendant Missouri, Kansas & Texas Railway Company for such sum as you may believe and find from the evidence was and is the reasonable value of the services as auditor, if any, performed by plaintiff for the benefit and account and in behalf of defendant Missouri, Kansas & Oklahoma Railroad Company.''

I. Learned counsel for plaintiff contend that, Instruction No. 2, having been given at the request of defendant, the court erred in refusing to give Instruction No. 1, requested by plaintiff, which counsel say is ''the very counterpart'' of number 2. To sustain such contention counsel argue that the entire theory of the case, as made by defendant, was submitted to the jury by Instruction No. 2, and that Instruction No. 1, covering plaintiff's theory of the case, should not have been excluded from the consideration of the jury. If, as is stated, Instruction No. 1 is the ''counterpart'' of No. 2, then plaintiff was not prejudiced by the action of the court in refusing to give Instruction No. 1 (which according to counsel corresponded to or was a duplicate of Instruction No. 2), as Instruction No. 2 was given and was before the jury, thereby giving plaintiff the benefit of the jury's consideration thereof.

But we are not confined to upholding the refusal of Instruction No. 1 upon that ground. Plaintiff predicat-

*Instructions.*

ed his case upon the final deed from the Missouri, Kansas & Oklahoma Railroad Company to defendant Missouri, Kansas & Texas Railway Company, dated November 3, 1904, whereby said defendant assumed and agreed to pay all debts, demands, claims and liens of the said Missouri, Kansas & Oklahoma Railroad Company. The evidence showed that the Missouri, Kansas & Oklahoma Railroad Company transacted no business of any kind and performed no functions as an active company after June 30, 1904; that after that date the property of that company, "from an operating and business standpoint was handled as the property of the Missouri, Kansas & Texas Railway Company, by the officers of the latter company," who were also officers of the Missouri, Kansas & Oklahoma Railroad Company; that all the books and records of said Missouri, Kansas & Oklahoma Railroad Company were delivered into the custody of the defendant Missouri, Kansas & Texas Railway Company; that the accounts in the books of the Missouri, Kansas & Oklahoma Railroad Company "were shown only to November, 1904;" and that "if there were any accounts of the Missouri, Kansas & Oklahoma Railroad Company, kept after November 1904, they were kept by the Missouri, Kansas & Texas Railway Company." Plaintiff, in addition to being auditor of the Missouri, Kansas & Oklahoma Railroad Company was also auditor of defendant Missouri, Kansas & Texas Railway Company, at a salary of $7500 per annum. He testified that he began auditing the books and accounts of the Missouri, Kansas & Oklahoma Railroad Company immediately after his appointment as auditor of that company on June 14, 1904, and concluded the services in June, 1912; that he kept the accounts and books in the office of the Missouri, Kansas & Texas Railway Company, sometimes at night, and "outside of regular duties which I performed for the Missouri, Kansas & Texas Railway Company." He sued on the theory that the Missouri, Kansas & Oklahoma Railroad Company was indebted to him for services rendered between June 14, 1904, and

June, 1912, which indebtedness he claims the defendant Missouri, Kansas and Texas Railway Company assumed and agreed to pay. He introduced no evidence as to the value of the services rendered by him between June 14, 1904 and November 3, 1904, upon which latter day the Missouri, Kansas & Oklahoma Railroad Company conveyed all of its property to the defendant Missouri, Kansas & Texas Railway Company. Clearly, compensation for services rendered subsequent to November 3, 1904, constituted an indebtedness which accrued *after* the execution of the conveyance upon which he relies. The court of its own motion, gave Instruction No. 4, which, when supplemented by Instructions No. 2 and No. 3, in our opinion embraces all of the issues presented by the pleadings and the evidence in the case. With the exception of submitting the question of the value of services rendered by plaintiff after November 3, 1904, which the evidence did not warrant, Instruction No. 4 covers every phase of the case contemplated by plaintiff's Instruction No. 1, and adheres to plaintiff's theory of the case.

We therefore hold that no error was committed in refusing Instruction No. 1. [State ex rel. Robertson v. Hope, 102 Mo. 410; Meadows v. Life Ins. Co., 129 Mo. 76; Bank v. Hatch, 98 Mo. 376; Anderson v. Railway Co., 161 Mo. 411.]

II.   Plaintiff next contends that Instruction No. 3, given for defendant, was "ambiguous and confused the jurors," and counsel argue that it practically told the jury to find for one cent. To this we cannot give assent. The language used is clear and concise and in no way equivocal. The rule here applicable is, that where there is no evidence from which the value of the services can be estimated, plaintiff is not entitled to recover more than nominal damages. [Woodward v. Donnell, 146 Mo. App. 119; Owen v. O'Reilly, 20 Mo. 603; Cravens v. Hunter, 87 Mo. App. 456; Weber v. Squier, 51 Mo. App. 601; Brown v. Emerson, 18 Mo. 103; King v. St. Louis, 250 Mo. l. c. 513.] And

Nominal Damages.

the state of proof as to the reasonable value of the services of plaintiff as auditor of the Missouri, Kansas & Oklahoma Railroad Company from June 14, 1904, to November 3, 1904, being such that the jury could not with any approximate correctness calculate the same defendant was entitled to have incorporated in the instruction a limitation to nominal damages. [King v. St. Louis, supra; Sang v. St. Louis, 262 Mo. l. c. 463.] And by nominal damages, as here obtains, is meant, "those awarded where from the nature of the case, some injury has been done, the amount of which the proofs fail entirely to show," or, differently expressed, "a trifling sum awarded where a breach of duty or an infraction of the plaintiff's right is shown, but no serious loss is proved to have been sustained." [Bouvier's Law Dicticnary, Nominal Damages.]     Nor did the court err in referring to the nominal damages to be recovered as "one cent." [Segelke v. Finan, 1 N. Y. Supp. 381; Bennum v. Coursey, 76 Atl. 53; Ransone v. Christian, 56 Ga. 351.] We therefore rule the point against plaintiff.

III.  (a)  Plaintiff maintains that the court improperly excluded that portion of the deposition of plaintiff which began with the question, "Will you give, in order, the services, fixing the amount of work that you did in connection with the audit of the accounts of the company; will you give a general estimate of that work?"  A review of the answer to this and the succeeding questions which were excluded leads us to conclude that this contention is unfounded.  The trial court, in sustaining the objection of defendant thereto, ruled that "there is some matter that might be admissible, but it is so intermingled with matter that has nothing to do with the issues in here, that I don't see how it can be separated."  And so think we, except that we are of the opinion that none of the matter was pertinent to the real questions in the case.  The testimony given is a lengthy, involved and abstract statement relating to the bonded indebtedness, the capital stock, and the financing

*Evidence.*

of the Missouri, Kansas & Oklahoma Railroad Company, and was not material or relevant to the issues. We rule the point against plaintiff.

(b) Plaintiff also asserts that the court committed error in excluding that testimony of witness Ambrose, the certified public accountant, aimed to bring out an opinion as to the reasonable value of the services performed by plaintiff. A review of this evidence shows that in the main it was a colloquy between counsel for plaintiff and for defendant and between the court and the witness, looking towards an adjournment of the case in order to allow the witness time to inspect the books of the Missouri, Kansas & Oklahoma Railroad Company offered in evidence. The witness stated, in substance, that if given sufficient time to examine the books he could form an estimate as to the time required to audit the same and in that way arrive at an estimate of the cost of the work. On the whole the testimony was not responsive to the inquiry, proved no pertinent fact in the case and in our opinion no harm resulted from the exclusion thereof. The hypothetical question asked was objectionable, and properly excluded, for the reason that it did not embody substantially all the material facts relating to the subject on which the judgment of the witness was sought. [Mammerberg v. Street Ry. Co., 62 Mo. App. 563; Ridenour v. Mines Co., 164 Mo. App. 576; Quinley v. Traction Co., 180 Mo. App. 287.] Accordingly we also rule this point against plaintiff.

IV. Plaintiff further insists that it was an abuse of discretion on the part of the trial court to refuse a continuance or adjournment of the case until the next day, so that the witness Ambrose might examine the accounts appearing in the books of the Missouri, Kansas & Oklahoma Railroad Company. The record tends to show that the books were in court during the day of the trial, available to plaintiff, and it would seem that plaintiff's witness, who the record discloses was present in court before being put upon the witness stand, could probably have made some inspec-

Continuance.

tion thereof previous to testifying. At any rate it is the rule that the granting and refusing of a continuance is largely within the discretion of the trial court, and unless a clear abuse of such discretion is shown, the action of the court will not be disturbed. [Pidgeon v. United Rys. Co., 154 Mo. App. 20; Rhodes v. Guhman, 156 Mo. App. 344; Gregory v. Hansen, 224 S. W. 82; Lackey v. Lubke, 36 Mo. l. c. 120.]

We hold that in the instant case there was no such abuse of discretion.

V. Plaintiff finally contends that the verdict is grossly inadequate. By Instruction No. 4 the jury were instructed that if they found for plaintiff they should find "for such sum as you may believe and find from the evidence is the reasonable value of the services performed by the plaintiff (if any) as auditor of the Missouri, Kansas & Oklahoma Railroad Company, between the 14th day of June, 1904, and the 3rd day of November, 1904." By Instruction No. 3, the jury were told that "if under the evidence you are unable to determine the value of such services" (rendered between June 14, 1904, and November 3, 1904); "your verdict, if you find for the plaintiff, will be for nominal damages only or one cent." Under all the evidence in the case there was no showing whatsoever as to the value of the services rendered during the period of time mentioned—about four and one-half months. Having no basis for computation before them, the jury were justified, under the instructions given, which instructions were in turn warranted by the evidence, in returning a verdict for nominal damages only. [Woodward v. Donnell, 146 Mo. App. 119; Cravens v. Hunter, 87 Mo. App. 456; Zimmerman v. Produce Co., 192 S. W. 1038; Brown v. Asphalt Mfg. Co., 210 Mo. 260.]

Counsel for plaintiff argue that "since men generally know the character and nature of auditing work and the reasonable value of such services" the jury returned

*Inadequate Verdict.*

a "grossly inadequate and unjust verdict." But, as was said by REYNOLDS, P. J., in Woodward v. Donnell, supra, at page 125, a case involving the value of services rendered by a dentist's assistant, "Certainly such employment is not so common or the value of such services so within the common knowledge of all men, that courts and juries are to be presumed to know that value without any proof thereof." And so in the case at bar, the reasonable value of such services as plaintiff performed is not a matter of such common knowledge that testimony upon the subject was unnecessary. We therefore hold against plaintiff on this point.

Respondent in its brief deals with but few of the errors assigned by plaintiff, but advances the argument that there was total failure of proof by plaintiff, that he cannot recover for extra work performed in the absence of an express contract therefor, and that the services performed by him were presumed to be paid for by his regular salary of $7500 per annum. It is unnecessary for us to pass upon those phases of the case, other than as herein adverted to.

After a careful review of the record we find nothing to justify an interference with the judgment and it is accordingly affirmed. All concur.