William W. DAVIS, Respondent,

v.

JEFFERSON SAVINGS & LOAN
ASSOCIATION, Appellant.

No. 58606.

Missouri Court of Appeals,
Eastern District,
Division Four.

Oct. 22, 1991.

Rehearing Denied Nov. 18, 1991.

Application to Transfer Denied
Jan. 28, 1992.

Rollin J. Moerschel, Victor S. Williams, St. Charles, for appellant.

James B. Herd, St. Louis, for respondent.

SATZ, Judge.

This is an action in trespass. Plaintiff-lessee, William Davis, sued defendant-lessor, Jefferson Savings and Loan Association, for trespass to the leased premises. The jury returned verdicts on two separate counts in favor of plaintiff. Defendant appeals. We reverse and remand.

■ Among its many arguments, defendant argues that plaintiff failed to make a submissible case in trespass in either count. To determine submissibility, we view the evidence and permissible inferences in the light most favorable to the verdict, disregard contrary evidence and inferences and determine whether the evidence so viewed was sufficient for at least nine reasonable people to reach the verdict the jury did. *Marti v. Economy Fire and Casualty Co.*, 761 S.W.2d 254, 255 (Mo.App.1988).

The land in question is 280 acres of 34 separately numbered tracts, near Lake St. Louis. In 1982, the land was owned by West Hamilton Joint Ventures (West Hamilton). Plaintiff is a farmer and farmed the land under a written lease with West Hamilton. In November, 1982, plaintiff signed a lease with West Hamilton for a 12 month term, from November 1, 1982 until October 31, 1983. Plaintiff was to make two rental payments, one on August 1, 1983 and the other on December 28, 1983.

Defendant purchased the land from West Hamilton in August, 1983 for investment and development. A month later, plaintiff received a letter informing him of that purchase. At that time, plaintiff was preparing to plant some wheat and, apparently, was concerned about his status on the land. He telephoned a Mrs. Terri Flowers, defendant's manager of the land, to discuss his concern. During a meeting the next day, she told him "there wouldn't be no [sic]

problem with [him] farming the ground like [he] always farmed." Sometime later in September, plaintiff also discussed his concern with a Mr. Drew Kuenneke, then defendant's vice-president, who told plaintiff there would be "no problem for him farming the ground whatsoever."

In October, plaintiff planted wheat in tract No. 8. Sometime later in October, Mr. Kuenneke and a Mr. Steve Wilson, a horticulturist employed by defendant, stopped by to talk to plaintiff about using part of the land for a plant and tree nursery. Plaintiff suggested Tract 31, adjacent to Tract No. 8. Mr. Kuenneke and Mr. Wilson drove over to Tract 31 to look at it and, in doing so, drove on a road around the edge of Tract 8.

Sometime in late October or early November, Mr. Wilson returned and, apparently, this time drove his car across Tract No. 8, which had wheat three inches high. When plaintiff subsequently complained about this to Mr. Wilson in early November, Mr. Wilson responded that "he could drive anywhere he wanted to drive."

Then, apparently again in November, shortly after this incident, defendant built "a road across the wheat field", 20 feet wide and 1000 feet long. Later, "near the end of the year", plaintiff saw "people [employed by defendant] putting a nursery in back on the wheat field." These people drove trucks, "carrying all different sizes of shrubs", over the road, and, when "passing each other on the road", they drove off the road "anywhere they wanted to drive." When plaintiff complained about this a few days later, Mr. Wilson told him "we can go anywhere we want to go out here and do anything we want to do." Also, in November and December, plaintiff saw trucks driving into the wheat field and dumping rubbish into holes that had been "bulldozed" in the field.

These events took place before January, 1984. The termination date of the lease plaintiff had entered into with West Hamilton, October 31, 1983, had long since passed. In January, 1984, Ms. Flowers contacted plaintiff and told him she had a lease for him to sign. The proposed lease covered the entire 280 acres and expired in April, 1984. Plaintiff refused to sign it because he would not begin most of his planting until April or May and would not have the harvest "out until October or November." Ms. Flowers saw no problem with that and said she would draft another lease covering the land. Apparently, that lease was never drafted.

However, later in January, after some further discussion, plaintiff did sign a lease for "60 acres more or less", which included Tract No. 8. The lease was a printed form to which two provisions were added: (1) "If any crops are destroyed by [defendant], then [defendant] will pay for the cost of the crops as compensation to [plaintiff]", and (2) "No trash, debris, or metal may be dumped or stored on the property under contract." The former provision was typed in at plaintiff's insistence, the latter was typed in before the lease was presented to him. The term of this lease was back dated to November 1, 1983 and was to expire on April 30, 1984. Plaintiff never signed a lease with defendant on the remaining 220 acres.

At some time, apparently after the 60 acre lease was signed, surveyors employed by defendant went onto the tracts covered by this lease, surveyed the wheat field, drove some three to four hundred stakes into the ground and trampled the wheat as they completed their survey. Defendant put a "barricade" or "cable" across the roads leading to the wheat field. This occurred in November, 1983, according to plaintiff and in April, 1984, according to defendant.

There were also incidents related to the 220 acres not covered by the 60 acre lease. In February, 1984, plaintiff went out "to look [that] ground over" and, in one area, found "sewer lines, roads being cut in, basements being dug, [and] footings being put in."

Plaintiff sued defendant in trespass in two counts. In Count I, he alleged he leased 60 acres from defendant; defendant "entered upon the land without plaintiff's permission and destroyed significant portions of plaintiff's wheat crop." In Count

II, he alleged he was a "holdover" tenant under the West Hamilton lease; thus, creating "an oral lease from year to year" to the remaining 220 acres; defendant "entered upon the land without plaintiff's permission" and "generally rendered large portions of the land unfit for farming." Plaintiff prayed for actual and punitive damages in both counts. The jury awarded plaintiff $2,651.00 in actual damages and $431,890.50 in punitive damages on Count I and $24,323.00 in actual damages and $143,964.18 in punitive damages on Count II.

Defendant's detailed argument against submissibility is repeated throughout its brief and is intertwined with an additional fifteen Points. Each of the Points has sub-issues. Most of the issues are repetitions dressed in different language. We address the dispositive issues and those which may arise again on retrial.

### Defendant's Basic Argument

■ Defendant makes one basic argument against submissibility which runs throughout its brief and is couched in a variety of legal jargon. Defendant argues that plaintiff had no claim in trespass against it under either lease because it had a right to do what it did under both leases.

Both leases, defendant notes, contain the following printed provision:

> [Defendant] reserves the privilege of plowing the stubble ground when [plaintiff] may have secured the grain grown thereon; and further, that [defendant], or his legal representative, *may enter upon [the] premises for* the purpose of viewing, or of seeding, and of making repairs or *any other purpose.* (emphasis added).

Defendant reads the emphasized language literally. It argues this language—may enter upon [the] premises for ... any other purpose—grants it the unconditional right to enter upon the land for any purpose, and, thus, whatever it did on the land could not constitute a trespass.

Even though defendant contends it could commit no trespass, it admits that it did promise to pay damages for its destruction of any of plaintiff's crops on the 60 acre tract; but, defendant argues, this was a contractual promise limiting its damages for any destroyed crops, as a matter of contract principles, to "the cost of the crops as compensation." The West Hamilton lease, defendant notes, contains no comparable promise and, thus, insofar as that lease and plaintiff's holdover tenancy is concerned, defendant argues, it committed no trespass, breached no contract and, in turn, incurred no liability for damages. Defendant's literal reading of this language is not reasonable.

Arguably, using contract principles, the 60 acre lease may be sensibly subject to defendant's reading. The West Hamilton lease, however, is not. Under defendant's interpretation, the latter lease would grant defendant the unconditional right to destroy plaintiff's ready-to-harvest crops on the remaining 220 acres. We cannot sensibly say that plaintiff, as a sane tenant, would have agreed to that.

Both leases must be read sensibly. People must be taken as they are and language as it is. We read language reasonably not unreasonably. *Tri-Lakes NewsPapers, Inc. v. Logan*, 713 S.W.2d 891, 894 (Mo. App.1986). Reasonable contracting parties would read "for any other purpose", in both leases, as "for any other reasonable purpose." This grants the landowner the right or privilege to re-enter the land for any reasonable purpose necessary or incidental to protecting its interests or to furthering its goals and, after entry, to conduct itself reasonably to achieve those ends. The landowner's conduct, however, is privileged only to the extent it does not violate the tenant's possessory rights.

We read both leases that way. This reading does contemplate a violation of the tenant's possessory rights to be a trespass. And, we have found no law, and the parties have cited none, which precludes the landowner from becoming a trespasser if, after his lawful entry, his acts exceed the scope of his privilege or right of re-entry. *See* also *Bert v. Rhodes*, 258 S.W. 40 (Mo.App. 1924); Restatement (Second) of Torts,

Chapters 7 and 8; § 214 (1965). This does not end the matter, however.

### The Parties' Legal Relationship

The parties view their legal relationship from two different perspectives. Plaintiff views a lease primarily as a transfer of a possessory interest or an estate in the land and, in turn, views his legal relationship with defendant as being defined and governed by property principles. Defendant views a lease primarily as a contract and, in turn, views its legal relationship with plaintiff as being defined and governed by contract principles. Both view their legal relationship too narrowly.

Traditionally, a lease is defined as "a transfer of the right of possession of specific property for a temporal period or at will." Schoshinski, *American Law of Landlord and Tenant*, § 1.1 at 1 (1980); *see, e.g., Friend v. Gem Int'l., Inc.*, 476 S.W.2d 134, 137–138 (Mo.App.1971); *Johnson v. Simpson Oil Co.*, 394 S.W.2d 91, 96 (Mo.App.1965). This traditional view of a lease developed at the time when most leases were of agricultural land and was accompanied by "the theory that the lessee is the owner of an estate in land." Lesar, *The Landlord—Tenant Relation In Perspective: From Status To Contract And Back In 900 Years*, 9 U of Kansas L.Rev. 369, 371 (1961).

This view disregards the contractual aspects of a modern lease. Today, in Missouri, we view a lease not merely as conveyance of a possessory interest in property but also as a bilateral contract. *C & J Delivery, Inc. v. Vinyard & Lee & Partners, Inc.* 647 S.W.2d 564, 567–568 (Mo.App.1983); *Gem Int'l., Inc.*, at 138.

> [A] lease is a species of contract for the possession and profits of land for a determinate period, .... [It] creates an estate in the tenant with transfer of exclusive possession and control of the premises to the tenant subject to such conditions as may be imposed by the terms of the contract creating the tenancy.
> *St. Louis Terminals Corp. v. City of St. Louis*, 535 S.W.2d 593, 596–97 (Mo.App. 1976).

The contractual nature of a lease most often stems from the modern urban lease where the primary focus is not land but space and the landlord promises to perform services, such as heat, hot water and repair, which are the type of services usually purchased by contract. *Lesar, supra* at 372–375.

■ "Historically", it has been said, "the landlord-tenant relation has moved from status to contract to property to modern contract." *Id.* at 377. In Missouri, when the legal relation between a plaintiff and defendant can be based both on status and contract, the plaintiff normally has the right to sue the defendant either in tort or in contract. *See, e.g. Davidson v. Hess*, 673 S.W.2d 111, 112–113 (Mo.App.1984).

### Count I

■ Both leases in question here, the 60 acre lease and the West Hamilton lease, are form agrarian leases with printed provisions focused primarily on the transfer of a possessory interest in the land itself. This, however, did not preclude the parties from negotiating and adding additional provisions. That is, in fact, what did take place when the 60 acre lease was signed.

The 60 acre lease was signed on January 30, 1984. At that time, most of defendant's alleged trespasses to this 60 acre tract had occurred. But, at that time, plaintiff's only lawful possessory interest would be derived from his status as a possible holdover tenant under the West Hamilton lease for the entire 280 acres. Nonetheless, in Count I, plaintiff sued defendant for alleged trespasses to his possessory interest in the 60 acre tract based upon the 60 acre lease. Plaintiff does not explain, and defendant does not question, how the back-dating of the 60 acre lease from January 30, 1984 to November 1, 1983 can create a possessory interest in plaintiff in 1983, susceptible to being violated by alleged acts of trespass that had already occurred.

Be that as it may, the parties obviously intended the lease to be effective retroactively as of the earlier date, November 1,

1983; and they tried this case and argued this appeal as if this legal fiction were valid. It is. 17A Am.Jr.2d § 184 (1991). Nothing in the record, however, shows what they believed their respective right and duties would be based on this legal fiction and under the back-dated lease.

But, at the time the parties negotiated the provisions of the lease, most of defendant's alleged acts of trespass on the 60 acre tract had occurred, and the parties did know the nature and extent of these acts. Moreover, at that time, plaintiff believed he had some claim against defendant. He already had sent defendant at least one bill for damages to his wheat.

Thus, insofar as defendant's liability for crop damages was concerned, what took place during the negotiations for the 60 acre lease was a straightforward bargain. Plaintiff relinquished his right to sue defendant in tort for trespass in exchange for defendant's promise to pay plaintiff the cost of any prior or future damage to or destruction of plaintiff's crop. This simply leaves plaintiff with the right to sue in contract.[1]

We are aware of the general principle which voids contract provisions exempting a party from tortious liability for harm caused either intentionally or recklessly, at least, insofar as prospective or unknown retrospective conduct is concerned. *See, e.g. Liberty Financial Management Corp. v. Beneficial Data Processing Corp.,* 670 S.W.2d 40, 47–48 (Mo.App.1984); Restatement (Second) of Contracts § 195, comment a (1981); 6A *Corbin On Contracts* § 1472 at 596–597 (1962), Pocket Part at 132–134 (1991). These exculpatory provisions are held to be void as against public policy. *Restatement and Corbin, supra.* Their invalidation can also be justified by refusing to construe the reasonable intention or contemplation of contracting parties to be an exemption of one of them from liability for prospective intentional or reckless tortious conduct.

Neither party here has raised or discussed the possible effect this general principle may have on the contract issues raised by defendant. To us, the principle should have no effect. At the time plaintiff entered into the 60 acre lease, he knew the conduct defendant had engaged in, decided what liability he believed defendant should incur for that conduct and expressly requested that that liability be reflected in the damages' provision of the 60 acre lease by requiring defendant to pay "the cost of the crops as compensation" for any crops it destroyed. Neither public policy nor reasonable rules of construction logically permits this plaintiff to seek damages other than those he expressly and unquestionably bargained for and requested.

For reasons which we will subsequently state, we will reverse and remand this case for re-trial on Count II. On the facts here, we deem it proper and hold that, on remand, plaintiff be permitted to fashion a claim in contract under the 60 acre lease consistent with this opinion, if he decides it is necessary or appropriate to do so.

### Landowner's Trespass After Lawful Entry

■ Although we agree with defendant that plaintiff's claim based upon the 60 acre lease must sound in contract, we expressly reject one argument made by defendant to support this position. Defendant contends that if a landowner makes a lawful entry on to land he leased to a tenant pursuant to a right or privilege to re-enter, the landowner's subsequent conduct exceeding the scope of his right or privilege cannot be a trespass but simply would be a breach of the lease as a contract.

We have read the cases cited by defendant and the CJS citation relied on by the courts in two of those cases. Neither the cases nor their citations support this proposition. CJS and the Restatement both state as black letter law that "one entering upon land rightfully may commit a trespass

---

**1.** Similar reasoning and analysis would produce the same result, if the possessory interest of plaintiff violated by defendant were not created by the backdating of the 60 acre lease but by plaintiff being a holdover tenant under the West Hamilton lease.

by his subsequent wrongful acts." 87 CJS § 14 (1954); Restatement, *supra*, § 214. Although the actor in question is usually a licensee who, after a lawful entry, exceeds the scope of his license, we believe the same reasoning applies to a landowner who exceeds the scope of his right or privilege to re-enter. *See, e.g. Bert v. Rhodes, supra.*

### Plaintiff's Damages—Count I

■ Defendant argues that plaintiff's proof of his actual damages was insufficient because plaintiff's proof showed the maturity value of the damaged crop, not the "cost" of that crop as required by the lease. Defendant makes the bald statement that the term "cost" as used in the lease includes only the cost of the wheat seed and other materials and labor expended on the wheat crop, but it does not include profit. This bald statement fails to convince us that the norm for computing damages to crops was not contemplated by the parties and should not apply here.

■ The normal measure of damages for the partial destruction of a growing crop is the difference between the maturity value of the crop immediately before and immediately after its destruction. *Moore v. Woolbright*, 670 S.W.2d 190, 192 (Mo. App.1984); *Beaty v. N.W. Electric Power Coop.*, 296 S.W.2d 921, 924 (Mo.App.1956). A deduction from this difference must be made of the amount of expenses saved because of the destruction: for example, production, harvesting and marketing expenses. *Beaty* at 924. Absent a further showing, this is the proper method of calculating damages here.

Plaintiff argues he did not save any expenses because (1) defendant's acts of trespass took place after plowing, fertilizing, and seeding, (2) wheat is not cultivated, and (3) the combining and marketing expenses would have been the same even without the acts of trespass. Plaintiff, however, fails to include in his brief any citation to the transcript to support any of these statements. Such a citation is required in both the statement of facts and argument in the brief. Rule 84.04(h). Moreover, we have read the transcript pages where plaintiff proves his damages and his expenses saved on the 220 acres, but we did not find any mention that he failed to save any expenses on the crops allegedly destroyed on the 60 acres. Furthermore, plaintiff failed to ask at trial and on appeal that judicial notice be taken that no expenses would be saved, and, in any event, we would decline to do so. *See Beaty*, 296 S.W.2d at 924.

### Count II

Defendant contends plaintiff failed to prove he was a holdover tenant on the 220 acre tract because he failed "to prove the essential elements of a new oral 220 acre lease; to wit, duration, rent, dates of rent payments, and specific identification of the rented land...." This argument is misdirected and, thus, misses the mark.

■ "'In order for a tenancy to result from the holding over, the landlord must exercise his election, indicating in some way his consent to the tenancy. *Usually, the consent will be evidenced by the acceptance of rent.*'" (Emphasis theirs.) *Watkins v. Wattle*, 558 S.W.2d 705, 712 (Mo.App.1977). However, the consent may be either express, inferred or implied. *Millhouse v. Drainage Dist. No. 48 of Dunklin County*, 304 S.W.2d 54, 59 (Mo. App.1957). Here, plaintiff testified he was told twice by defendant's agents that he could continue to farm the 280 acres covered by West Hamilton lease after it expired. That was sufficient to make a submissible case on plaintiff's theory that he was a holdover tenant.

■ However, defendant also contends that plaintiff's verdict directing instruction submitting the issue of the holdover tenancy was prejudicially erroneous. Plaintiff's instruction reads:

"Your verdict must be for plaintiff if you believe:

First, plaintiff was in possession of the 220 acres of farmland on October 31, 1983 under a written lease contracted with West Hamilton Joint Venture; and

Second, defendant purchased the aforementioned farmland; and

Third, after said purchase, defendant verbally consented to plaintiff's tenancy for the year next following October 31, 1983 or defendant, by its conduct, implied its consent to plaintiff's tenancy for the year next following October 31, 1983; and

Fourth, defendant thereafter intentionally entered into the aforementioned farmland without plaintiff's permission or consent."

As can be seen, in the third paragraph, plaintiff bases his claim as a holdover tenant on defendant's verbal consent *or* defendant's "conduct." The term "conduct", defendant notes, has no defined dimensions, and, thus, defendant contends, the jury could use any "conduct" of defendant to find defendant's "implied consent." We agree.

■■■■ Instructions must be designed to preclude the submission of detailed evidentiary facts and limit the submission only to issues of ultimate fact. *Grindstaff v. Tygett*, 655 SW.2d 70, 73 (Mo.App.1983). An instruction authorizing a verdict, however, must require a finding of all ultimate facts necessary to sustain the verdict. *Id.* Admittedly, our courts have been unable to fashion precise, universally applicable definitions which explicitly differentiate evidentiary facts from ultimate facts, and, thus, if not clearly directed by our form MAI, we decide the propriety of an instruction on a case by case basis.

Here, the jury was simply not told what alleged conduct of defendant they were permitted to use to infer defendant's consent. It was permitted to roam freely through the evidence and choose any facts which suited it fancy or its perception of logic. This was an unacceptable, roving commission. *Snyder Bros. Co. v. Library Landholders, Inc.*, 718 S.W.2d 633, 636 (Mo.App.1986).

■■■ Defendant next argues that plaintiff failed to prove that defendant trespassed on the entire 220 acres, although he was awarded damages for trespass to the entire 220 acres. We agree.

Plaintiff did not plan to plant 220 acres of crop. Instead, he planned to plant only 170 acres of corn and beans and to collect government "Payment in Kind" for the remaining 50 acres. In fact, he did receive these government payments. Plaintiff said that he expected his profit on the beans and corn would have been some $24,000. The jury awarded him slightly more than that as actual damages.

However, in proving defendant's trespasses on the land within the 220 acres, plaintiff showed acts by defendant on only two of the 30 or more tracts within the 220 acres. He did not present any evidence of any entry of an employee or agent of defendant on any tracts other than those two. Moreover, there was no proof that the tracts defendant did enter made up the entire acreage that plaintiff planned to plant. Our examination of the exhibits leads us to conclude those tracts represent considerably less than half the acreage plaintiff possessed. Where there is no entry, there can be no trespass. *Crook v. Sheehan Enterprises, Inc.*, 740 S.W.2d 333, 335 (Mo.App.1987).

Plaintiff, however, argues his evidence showed "that he was effectively ejected from the land" and he knows of no law which would require him to plant his crops "[a]ll in the hope and expectation that his labors and capital investment would not be gut shot by [defendant's] continued trespass and destruction of his property!" The indignation of plaintiff's counsel notwithstanding, this argument hardly shows defendant trespassed. Arguably, it may show defendant constructively evicted plaintiff, especially when combined with the evidence that defendant barricaded the roads. However, plaintiff did not plead that he was constructively evicted and did not submit that issue to the jury. If plaintiff were genuinely and justifiably apprehensive that his planting in the 220 acres would have been destroyed, he could have sought injunctive relief. *Reproductive Health Services, Inc. v. Lee*, 660 S.W.2d 330, 335 (Mo.App.1983). In any event, plaintiff failed to prove that defendant's trespasses prevented him from planting his entire crop, and, thus, he failed to prove he

was entitled to the actual damages he was awarded.

 Defendant also contends there was insufficient evidence to justify the award of punitive damages. Previously, in this opinion, we have effectively held that plaintiff was not entitled to punitive damages for the breach of the lease contract on the 60 acre tract. Insofar as the 220 acres are concerned, plaintiff's evidence does support the submission of punitive damages to the jury. Plaintiff complained several times to defendant's agents about their and other agents' intrusions upon the land. The agents' responses—we can do anything we want to do—showed a total and disdainful disregard for plaintiff's rights. This circumstantial evidence of the agents' mindset plus the evidence of the repeated intrusions on to the land was sufficient to show defendant had an evil motive or was recklessly indifferent to plaintiff's rights. MAI 10.01; *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989).

 Finally, defendant makes several attacks on the instructions and verdict forms used to submit the issue of punitive damages. Prior to trial, defendant requested a bifurcated trial pursuant to § 510.263 RSMo 1989 Supp., which, upon request, requires the amount of punitive damages to be submitted to the jury subsequent to and separate from the submission of liability for punitive damages. Defendant's request was granted.

Neither party, however, addressed the issue of whether § 510.263 must be applied to the present claims. The statute governs procedure, and a statute that is procedural is retroactive unless the legislature expressly states otherwise. *Wilkes v. Mo. Highway Comm'n.*, 762 S.W.2d 27, 28 (Mo. banc 19888). In enacting this statute, the legislature expressly stated the statute "shall apply to all causes of action accruing after the effective date of this act." H.B. 700, Laws of Missouri 1987, p. 812. The effective date is July 1, 1987. The claims here accrued in 1983 and 1984.

To us, the legislature's language expresses its intent that the statute does not apply retroactively. Admittedly, it did not

say the statute applies *only* to those causes of action that accrue after July, 1987. However, if the legislature's statement is not read as a limitation that the statute apply prospectively only, it is difficult to see what purpose the statement serves. Normally, any statute would apply to causes of action that accrue after its effective date. Thus, there is no reason to make that express statement, unless the statement is to be read as limiting the statute only to prospective application. *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 751 (Mo. App.1991). In short, a bifurcated trial was not compelled in this case.

Our Supreme Court has not yet approved instructions or verdict forms for use in a bifurcated trial under § 510.263. We do not believe this case is the appropriate case for us to fill that void.

Judgment reversed and remanded.

SMITH, P.J., and CARL R. GAERTNER, C.J., concur.