**Jimmy Wayne WHITE, Plaintiff–Appellant,**

v.

**John W. JAMES, et al., Defendants–Respondents.**

**No. 18138.**

Missouri Court of Appeals,
Southern District,
Division Two.

March 1, 1993.

Ronald J. Fuller, Rolla, for plaintiff-appellant.

J. William Turley, Williams, Robinson, Turley, & White, Rolla, for defendants-respondents.

MONTGOMERY, Presiding Judge.

This is a trespass case tried before a jury. Plaintiff received a judgment against Defendants for $1,000 nominal damages after the trial court determined Plaintiff failed to prove actual damages.[1] At the close of Plaintiff's case the trial court directed a verdict in favor of Defendants regarding the submissibility of Plaintiff's claim for punitive damages. At the same time and without protest from Defendants, the trial court directed a verdict for Plaintiff against all Defendants, instructing the jury to award Plaintiff nominal damages. Plaintiff appeals raising four points. We affirm.

Plaintiff's summarized points allege the trial court erred in (1) directing a Defendants' verdict on his claim for punitive damages, (2) refusing Plaintiff's tendered

---

1. Plaintiff's evidence on actual damages is not recited since he does not claim here any trial court error on this issue.

verdict directing instruction which submitted Plaintiff's punitive damage claim, (3) giving a verdict directing instruction which required an award of nominal damages but failed to submit punitive damages, and (4) giving a verdict directing instruction defining "nominal damages" that was complex, misleading, confusing and not impartial.

■ For the most part the evidence in this case is not in serious conflict. However, in deciding whether Plaintiff made a submissible case on the issue of punitive damages, we must "construe the evidence, together with all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff...." *Day v. Wells Fargo Guard Serv. Co.*, 711 S.W.2d 503, 504 (Mo. banc 1986). The Defendants herein were not entitled to a directed verdict unless reasonable minds, viewing the evidence in a light most favorable to Plaintiff, could only have found in Defendant's favor. *Zachary v. Kroger, Inc.*, 332 S.W.2d 471, 473 (Mo. App.1960); *Jarrell v. Fort Worth Steel & Mfg. Co.*, 666 S.W.2d 828, 833 (Mo.App. 1984).

Viewed in that light, the evidence reveals that Plaintiff and Defendant, St. James M.O.B., Inc.,[2] owned adjoining tracts of real estate in St. James, Missouri. Both properties faced Jefferson Street (which is also State Highway 68) with business buildings located on each property.

In September 1989, the James Clinic was experiencing problems with its sewer line becoming clogged. Repair efforts were unsuccessful, and it was decided a new sewer line was necessary. Richard Merenghi engaged the services of a plumbing contractor, James Holleman, to install the sewer line from the James Clinic to the city sewer line.

Holleman applied for and received an excavation permit for the sewer line from the City of St. James. Next, Merenghi and Holleman contacted George Piazzi, St.

James waste water plant operator, for advice on where the sewer line should be laid. At trial, Piazzi confirmed he had given an earlier statement indicating he believed the city had an easement over the sidewalk in front of Plaintiff's property, and he advised that the sewer line should be laid in that location. Another city employee, Brian Cornick, testified he was present when Piazzi spoke with Holleman and Merenghi and that Piazzi did not make the statement just mentioned. Cornick indicated they simply pointed in a northerly direction from the James Clinic. After obtaining the permit and after the conversation with Piazzi, construction of the sewer line commenced September 25, 1989.

Holleman hired a backhoe operator, Bruce Palmberg, to dig the trench. He dug a trench 25 feet long, 2 feet wide and 3 feet deep in the sidewalk area of Plaintiff's property in front of his building. About 1:00 p.m. that day Plaintiff first observed the excavation work. He objected to Palmberg, returned home, and within fifteen minutes Holleman came to Plaintiff's home. Holleman indicated he was "terribly sorry," stated they were unaware the excavation was on Plaintiff's property, and said we are "going to make it right." Plaintiff and Holleman then drove to the excavation site and all work stopped immediately.

Later that day, at the request of Merenghi, a State Highway Department representative met with Plaintiff and Merenghi. They discussed the location of the private property boundary lines and the right-of-way of State Highway 68. It was agreed that another meeting would take place the next day to clarify the location of those boundary lines.

On September 26, 1989, the same parties met again. The State Highway Department employee identified the location of

---

**2.** Other Defendants are John W. James, Charles A. James, Donald L. James, John W. James, Inc., Charles A. James, Inc., Donald L. James, Inc., General Partners, associated in a business of carrying on a medical practice under the common names and style of James Clinic Partnership and The James Clinic; Bruce Palmberg (backhoe operator who dug the trench in question); James Holleman, d/b/a All Plumbing (contractor for the sewer line); and Richard Merenghi (maintenance supervisor for James Clinic). For convenience, we will refer to Defendants collectively as the James Clinic.

the state highway right-of-way, and it was clear that the existing trench was not located on the state right-of-way. Plaintiff testified that at that meeting Merenghi agreed to make certain repairs to Plaintiff's property and pay certain expenses incurred by Plaintiff and his tenants. In return, the James Clinic would be granted a sewer easement across Plaintiff's property. Plaintiff then testified he told Merenghi to have the papers "drawn up" and he would sign. The next day Plaintiff observed Merenghi and Holleman talking to State Highway Department employees. Plaintiff joined the conversation and according to Plaintiff, Merenghi said their "agreement was off."

Plaintiff testified he first noticed "moisture" in the open trench coming from the direction of the James Clinic on September 26, 1989. He testified that from September 28, 1989, for six days, the trench was open and filled with "fluid." On October 6, 1989, the James Clinic filled the trench with sand.

Soon after the problem surfaced, the James Clinic had a survey made concerning the disputed area. Merenghi testified the survey, handed to him on September 28, 1989, confirmed the trench was on Plaintiff's property. That day Merenghi went to all employees in the James Clinic building and informed them to shut down and not use the bathrooms connected to the sewer line in dispute. According to Merenghi, the only moisture coming into the trench was sink water. He saw nothing but liquid in the trench and smelled nothing offensive while the trench was open.

Merenghi denied he made an agreement with Plaintiff. He testified his superiors told him to let their attorneys handle the problem. It is undisputed attorneys for the James Clinic commenced settlement negotiations with Plaintiff. Plaintiff received a draft of a proposed settlement from the Clinic's attorneys but objected to portions of it. In response, one of the Clinic's attorneys met with Plaintiff on October 7, 1989, still attempting to resolve the dispute. Plaintiff admitted that the entire course of correspondence and conversation with the Clinic's attorneys was aimed at settling the controversy. That goal was never met, as the parties were unable to agree. Plaintiff also testified the James Clinic offered him $50,000 for his property which he valued at $70,000.

By October 7, 1989, the James Clinic had obtained a permit to locate its sewer on the State Highway Department right-of-way. Subsequently, the James Clinic sewer line was completed, avoiding Plaintiff's property. Between October 11 and 17, 1989, the James Clinic made repairs to Plaintiff's property and repoured the damaged concrete. Plaintiff was not satisfied with the repairs, but that is not an issue before us.

■ Plaintiff's first contention is that the court erred in sustaining the James Clinic's motion for a directed verdict on his claim for punitive damages because the acts of the Clinic during its "continuing trespass" on Plaintiff's property constituted outrageous conduct.

Plaintiff argues that "the outrageous conduct of Defendants occurred, not when they dug the trench, allegedly by mistake. The outrageous conduct occurred when a protracted and continuous trespass occurred over a period of fourteen days during which time Defendants allowed sewage to flow in an open trench on Plaintiff's premises." In ruling the motion for directed verdict, the trial court said, "The nature of the trespass is not someone going onto land and staying there; it is a trench being dug. I don't think that the evidence supports the fact that the trench remained in its condition while they were trying to settle a mistake constitutes outrageous conduct." We have read the entire transcript and agree with the trial court.

In *Burnett v. Griffith*, 769 S.W.2d 780, 789 (Mo. banc 1989), our Supreme Court held that the existing instructions (MAI 10.01 and 16.01) were inappropriate and "do not clearly articulate the circumstances justifying punitive damages in a case of intentional tort...." A new MAI 10.01 was adopted by the Court which omitted use of the terms "malice" or "malicious." Now, MAI 10.01 requires the jury to find defendant's conduct "was outrageous be-

cause of defendant's evil motive or reckless indifference to the rights of others" before punitive damages can be awarded. Plaintiff contends only that the acts of the James Clinic demonstrate a reckless indifference to Plaintiff's rights.

Even when we view the evidence most favorable to Plaintiff, the record does not support his contention that "sewage" was allowed to flow in the trench. Plaintiff testified he first observed "moisture" and later noticed "fluid" in the trench. He did not testify of any foul odors. The only other witness to testify on this subject was Richard Merenghi. He testified the only moisture in the trench came from "sink water" because he ordered the restrooms "shut down." Like Plaintiff, he stated no offensive odors were present and he only observed liquid in the trench. Merenghi testified the trench was left open only until settlement negotiations failed, and the trench was then filled with sand. Based on this record, we cannot infer that sewage was allowed to flow in the trench unless "sink water" qualifies as "sewage."

We need not decide that question because the trial court found no outrageous conduct in view of the parties' settlement negotiations. In essence, the trial court found those facts indicate a lack of reckless indifference to Plaintiff's rights.

As stated, Plaintiff does not argue that the James Clinic acted with an evil motive in allowing "sewage to run in the trench." We have read all the cases cited by Plaintiff, and none find "reckless indifference" on facts even remotely similar to this case. Our research shows that a case typical of those finding outrageous conduct is *Davis v. Jefferson Sav. & Loan Ass'n*, 820 S.W.2d 549 (Mo.App.1991). There, plaintiff brought a trespass action after the agents of the defendant landlord drove across plaintiff's three-inch high wheat field. Plaintiff complained, but defendant's agents continued to drive on the wheat field and told plaintiff "we can go anywhere we want to go out here and do anything we want to do." The Court said, "This circumstantial evidence of the agents' mindset plus the evidence of the repeated intrusions on to the land was sufficient to show defendant had an evil motive or was recklessly indifferent to plaintiff's rights." *Id.* at 557. Contrasted with the facts in *Davis*, the James Clinic stopped work the day Plaintiff complained. Upon discovery of "moisture or fluid" in the trench, the James Clinic ordered toilet use to cease. All the while, the parties were negotiating for an easement covering the trench location when the moisture and fluid was obvious. Plaintiff was also offered a substantial sum for his property. These facts show an attempt to pacify, not outrage, Plaintiff.

■ Punitive damages are appropriate only where the conduct of defendant is outrageous because of defendant's evil motive or reckless indifference to the rights of others. *Walker v. Gateway Nat. Bank*, 799 S.W.2d 614, 617 (Mo.App.1990). When a party acts in good faith and in the honest belief that his act is lawful, he is not liable for punitive damages. *Id.* In *Walker*, defendant argued plaintiff failed to make a submissible case on the issue of punitive damages. Acting on the advice of counsel and with the good faith belief the bank had a right of setoff, defendant removed funds from plaintiff's certificate of deposit. The Court of Appeals ruled the evidence failed to show a reckless disregard for plaintiff's rights. Here, the parties negotiated in good faith (the Clinic acting on advice of counsel) for an easement while "fluid" was in the trench. When negotiations failed, Plaintiff's property was promptly repaired. Like *Walker*, this evidence fails to establish a reckless disregard for Plaintiff's rights.

As stated in *Burnett*, "there must be 'some element of outrage to justify punitive damages.'" 769 S.W.2d at 789, *quoting Bhagvandoss v. Beiersdorf, Inc.*, 723 S.W.2d 392, 397 (Mo. banc 1987), and the Restatement (Second) of Torts, § 908(1), cmt. b (1979). The trial court was correct in finding Plaintiff's evidence failed to show any outrageous conduct on the part of the James Clinic. *See Signorino v. National Super Markets*, 782 S.W.2d 100,

104–05 (Mo.App.1989). This point is denied.

■ Plaintiff's second and third points require no discussion since we have determined he failed to make a submissible case on the issue of punitive damages. Plaintiff's last point merits our attention. That point complains about Instruction 7 [3] which directed a verdict in favor of Plaintiff for "nominal damages." The instruction reads:

> You must award Plaintiff nominal damages.
>
> The term "nominal damages" as used in this instruction means a trifling sum awarded to a plaintiff in an action where there is no substantial loss or injury to be compensated, but still the law recognizes a technical invasion of plaintiff's rights or a breach of the defendant's duty, or in cases where, although there has been a real injury, the plaintiff's evidence entirely fails to show its amount.

Plaintiff contends this instruction violates Rule 70.02(e) [4] because it was complex, misleading and confusing. He argues the instruction should have defined "trifling," "technical invasion," and "substantial loss or injury."

■ Nominal damage is not defined in MAI. Because there is no applicable MAI instruction, "any error in the instruction is not presumptively prejudicial as it would be if the instruction had deviated from an applicable MAI instruction, and the burden of showing prejudice is on the plaintiffs." *Sooter v. Magic Lantern, Inc.*, 771 S.W.2d 359, 362 (Mo.App.1989).

At the instruction conference, Plaintiff's counsel neither objected to Instruction 7 nor requested any modification. Furthermore, he offered no alternative instruction on the subject. It follows that the alleged prejudicial effect of the instruction did not occur to Plaintiff until after the verdict. If the defect was not obvious to an astute counsel, most likely the jury was not confused or mislead by the instruction. *Murphy v. City of Springfield*, 794 S.W.2d 275, 279–80 (Mo.App.1990).

■ Although Rule 70.03 states that contemporaneous objections to instructions are not required to preserve claims of legal error, failure to raise the issue during trial may be considered in determining whether an erroneous instruction is prejudicial. *Hudson v. Carr*, 668 S.W.2d 68, 71–72 (Mo. banc 1984); *Cornell v. Texaco, Inc.*, 712 S.W.2d 680, 682 (Mo. banc 1986).

■ The challenging party has been required to prove the instruction misdirected, misled or confused the jury where the alleged error is failure to define terms used in the verdict-director. *Essex v. Getty Oil Co.*, 661 S.W.2d 544, 558 (Mo.App.1983). Plaintiff has not shown the jury was misled or confused because the verdict returned indicates complete understanding of the instruction. The James Clinic argued to the jury that one dollar was a trifling sum after Plaintiff argued that as intelligent people "you will have no trouble in deciding in your own mind what you think trifling is." Plaintiff's $1,000 verdict reflects that the jury fully responded to Plaintiff's argument. The error, if any, in submitting the instruction fails to show Plaintiff was prejudiced. Point denied.

The judgment is affirmed.

PREWITT and GARRISON, JJ., concur.

---

**3.** The Clinic's attorney prepared Instruction 7 indicating at the instruction conference it was taken "verbatim from Black's Law Dictionary." Defendants cite *Seelig v. Missouri, K. & T. Ry.*

Co., 287 Mo. 343, 230 S.W. 94 (1921), in further support of the definition in the instruction.

**4.** Rule references are to Missouri Rules of Court (1992).