Sally BROOKS, Plaintiff–Appellant,

v.

SSM HEALTH CARE, Central Region f/k/a SSM Health Care II d/b/a Arcadia Valley Hospital, and Fernando Decastro, M.D., Defendants–Respondents.

Nos. 23664, 23697.

Missouri Court of Appeals, Southern District, Division Two.

Feb. 6, 2002.

Motion for Rehearing and Transfer to Supreme Court Denied Feb. 28, 2002.

Application for Transfer Denied May 28, 2002.

Matthew J. Padberg, The Padberg Law Firm, St. Louis, for Appellant.

David G. Ott, Thomas B. Weaver, Jeffery T. McPherson, Armstrong Teasdale LLP, St. Louis, for Respondent SSM Health Care, Central Region.

John L. Oliver, Jr., Oliver, Oliver & Waltz, P.C., Cape Girardeau, for Respondent Fernando DeCastro, M.D.

**NANCY STEFFEN RAHMEYER,** Judge.

Sally Brooks ("Appellant") was awarded $315,000 for medical negligence against defendants SSM Health Care, Central Region ("SSM") and Fernando DeCastro ("Dr. DeCastro"). The trial court granted defendants' motions for a new trial, which Appellant appealed in case number 23664. The trial court then amended its order by specifying the grounds for the prior ruling, and Appellant appealed from the amended judgment in case number 23697. The appeals were consolidated. We reverse and remand for reinstatement of the jury verdict.

■ Initially, we must address SSM's arguments challenging this court's jurisdiction of both appeals and the jurisdiction of the trial court to enter an amended order.[1] The trial court's acceptance of the jury's verdict in favor of Appellant is recorded in a docket entry made the same day as the verdict, January 14, 2000. SSM contends that this docket entry was entered without the signature of the trial judge and therefore no judgment was entered in favor of Appellant because, according to Rule 74.01(a),[2] a judgment can be entered only when a writing signed by the judge and denominated "judgment" is filed. That may be true, but it is not dispositive in this case as we have jurisdiction to view the judgment granting a new trial, not the judgment approving the jury's verdict. *See Duckett v. Troester,* 996 S.W.2d 641, 646 (Mo.App. W.D.1999). Appellant is appealing from the decision granting a new trial, not from the approval of the jury's verdict. SSM and Dr. DeCastro admit that both of the signed or-

1. Dr. DeCastro disagrees with his co-defendant regarding our jurisdiction of the first appeal. Dr. DeCastro admits jurisdiction in appeal number 23664, but contends there is no jurisdiction in appeal 23697.

2. All rule references are to Supreme Court Rules (2001), unless otherwise stated.

ders granting a new trial qualify under Rule 74.01(a) as judgments.

■ SSM also argues that Appellant cannot appeal the order granting a new trial because that order did not deprive Appellant of a judgment in that the verdict of January 14th was not a judgment. According to SSM, if Appellant has not been deprived of a judgment, then Appellant has not been "aggrieved" pursuant to § 512.020, RSMo 2000, and cannot appeal.[3] SSM provides no cases to support its theory, nor has it offered an explanation why precedent is unavailable. As such, with no authority and no explanation why precedent is unavailable, we consider the argument waived or abandoned. *See Jordan v. City of Kansas City*, 972 S.W.2d 319, 322 (Mo.App. W.D.1998).

■ The judgment appealed from is reviewable. The trial court signed a document titled "Judgment & Order" that granted a new trial. We have jurisdiction to review that judgment. *See Duckett*, 996 S.W.2d at 646. We also find the trial court had the authority to amend that judgment. *See Taylor v. United Parcel Service, Inc.*, 854 S.W.2d 390, 392 (Mo. banc 1993)(wherein the trial court retained the authority to vacate, reopen, correct, amend or modify its judgment within thirty days as provided by Rule 75.01 and the timely filing of a notice of appeal did not shorten the thirty days granted to the trial court to do so).

We are further persuaded to review the second amended judgment by the words of the trial court indicating it intended its amended judgment to have a meaningful appeal on its rulings concerning the admission of testimony. When the court made its ruling concerning the granting of a new trial, it made the following statement:

> THE COURT: I want to give all the reasons, and I want [the defense attorneys] to address this.... The court certainly understands [Plaintiff's attorney's] position in this case and he has an absolute right to appeal this ruling and I want to do this [formally] .... but what I want to do is put it in writing and sign it, so [Plaintiff's attorney] can appeal and you can appeal each point and address each point. I think courts sometimes are a little lax in giving our reasons why we're doing things and I think if we're going to do something we ought to be able to explain it so you can address each point with the appellate court.

■ The comments show that all the parties and the court were aware of the standard of review regarding whether an appeal was a discretionary appeal[4] or an appeal as to whether a submissible case had been made.[5] The amended judgment sets forth the specific grounds for the

---

3. Section 512.020 states in part:
   Any party to a suit aggrieved by any judgment of any trial court in any civil cause from which an appeal is not prohibited by the constitution, nor clearly limited in special statutory proceedings, may take his appeal to a court having appellate jurisdiction from any order granting a new trial....

4. The trial court has broad discretionary power to grant one new trial on the grounds that the verdict was against the weight of the evidence. *O'Neal v. Agee*, 8 S.W.3d 238, 241 (Mo.App. E.D.1999). An order granting a new trial on the ground that the verdict is against the weight of the evidence will not be disturbed unless it is a manifest abuse of discretion. *Id.*

5. The law is well established that if the plaintiff makes a submissible case, an order granting a new trial to the defendant after a verdict for the plaintiff for the reason that the plaintiff failed to make a submissible case would be arbitrary and an abuse of discretion. *Lifritz v. Sears, Roebuck and Company*, 472 S.W.2d 28, 33 (Mo.App.1971).

granting of a new trial and indicates that Appellant did not make a submissible case because of the lack of expert testimony. An examination of the original order and the amended order indicates two differences between the orders. The sixth finding as stated in the original order is, "the Court ... is of the opinion that the verdict is against the manifold weight of the evidence." That paragraph was changed in the amended order and the following was added, "because Plaintiff's experts should not have been permitted to testify as described in paragraphs 'Third' and 'Fourth', supra." Additionally, the amended order states that the verdict director was "barred by the Court's ruling on the admissibility of certain opinion evidence as hereinafter set forth."

■ The amended language clarifies the trial court's intention as to whether the order is final so it could be appealed, and comports with the requirements of Rule 78.03. Rule 78.03 provides, "Every order allowing a new trial shall specify of record the ground or grounds on which said new trial is granted." Rule 84.05(c) states in part, "When a trial court grants a new trial without specifying of record the ground or grounds on which the new trial is granted, the presumption shall be that the trial court erroneously granted the motion for new trial and the burden of supporting such action is placed on the respondent." The purpose of requiring specificity in motions for new trial is to define the reason for granting the new trial, thereby limiting the issues cognizable on appeal and promoting judicial economy. *Dixon v. Bi–State Development Agency,* 636 S.W.2d 696, 698 (Mo.App. E.D.1982); *Hightower v. Hightower,* 590 S.W.2d 99, 103 (Mo.App. W.D.1979). The above-noted comments of the trial court and the fact that the order was amended at all indicates the trial court intended some effect to be given to the added language.

Finding there is an appealable judgment, we now turn to Appellant's arguments. Appellant's argue that the trial court erred in granting defendants' motion for new trial because Appellant's expert testimony was properly admitted. Appellant also argues that the court was incorrect in finding instructional error and in finding insufficient evidence to support Appellant's claim for future damages.

■ The underlying basis for granting a new trial was that Appellant's experts were unqualified to testify. If Appellant's experts are disqualified, there is no expert testimony that Dr. DeCastro breached the standard of care and that the breach caused injury to Appellant. To have made a submissible case of medical malpractice, Appellant must have established by expert opinion that Dr. DeCastro failed to use that degree of skill and learning ordinarily used by doctors under the same or similar circumstances and Dr. DeCastro's negligence caused the injury to Appellant. *See Washington v. Barnes Hospital,* 897 S.W.2d 611, 615 (Mo. banc 1995).

■ In determining whether the plaintiff has made a submissible case, we view the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff. *Coon v. Dryden,* 46 S.W.3d 81, 88–89 (Mo.App. W.D.2001). It is improper to withdraw a case from the jury unless there is no room for reasonable minds to differ. *Id.* at 89. There must be a "complete absence of probative fact" supporting the jury's conclusion before we can reverse the jury's verdict for insufficient evidence. *Id.; Seitz v. Lemay Bank and Trust Company,* 959 S.W.2d 458, 461 (Mo. banc 1998). On the other hand, if any one of Appellant's experts was qualified to testify to the standard of care and that the breach caused injury to the Appellant,

then Appellant has made a submissible case and it was error to set aside the judgment.

The issue tried in this case was whether Appellant was inappropriately given a medication known as tissue plasminogen activator ("tPA"). The jury found in Appellant's favor against Dr. DeCastro as the person who administered the tPA and against SSM on the basis of respondeat superior. An inappropriate administration of the drug allegedly caused a bleed into Appellant's spinal canal and neurological problems that required two subsequent surgeries to remove blood clots on the spinal cord. After the operations Appellant was seriously debilitated; her head was wobbly like a newborn baby's, she was unable to control her bladder or bowel movements, she had to be retaught how to write and had to learn to walk with a walker. The imbalance, incontinence, and weakness continued up to the time of trial.

Dr. DeCastro's[6] complaints concern all three of Appellant's experts. Specifically, Dr. DeCastro complains, and the trial court so found, that there was:

> [N]o evidence as to whether or not the Plaintiff's experts' theories could be proven objectively, and Plaintiff's experts each admitted that there was no scientific study which proved their theory. The Plaintiff's experts did not demonstrate that their methodology had been subject to peer review, and in fact, they admitted that there were no peer review articles substantiating or supporting their theory. The Plaintiff offered no evidence as to whether or not

these opinions were "generally accepted in the scientific community." Therefore, the Plaintiff did not meet the minimum standards of *Frye v. U.S.*, 293 F. 1013, 1014 (1923), nor of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) as applied in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).[7]

▆▆▆ Prior to deciding the merits regarding the expert testimony, we must address Appellant's argument that Dr. DeCastro and SSM waived any claim of error regarding lack of foundation of the experts' testimony that was presented by way of deposition. In his brief Dr. DeCastro cites to transcript pages from the trial where he objected to the testimony admitted by way of depositions. The transcript directs us to specific objections made to parts of the deposition.

No objections as to foundation were made at the time of the deposition. By scouring the record, we see the only specific objection to Dr. Young's testimony was not made during the deposition, but was made during the trial and was concerning the causal relationship between tPA and an epidural hematoma on the cervical spine. At the deposition neither defendant objected to an improper foundation for the opinion.

▆▆▆ Questions of whether the proffered expert opinion testimony is supported by a sufficient factual or scientific foundation are questions of admissibility and must be raised by a timely objection

---

6. Although there are two defendants, SSM primarily argues that this court was without jurisdiction to reach the merits of either appeal and does not specifically address the qualifications of Appellant's experts.

7. Dr. DeCastro asks that this court "face up to *Daubert*." At trial, Dr. DeCastro's counsel claimed that *Daubert* was controlling despite the fact that it has never been adopted in this state. Because we find the expert testimony complies with our state's precedent it is unnecessary to address Dr. DeCastro's argument.

or motion to strike. *Washington,* 897 S.W.2d at 616. A motion to strike is untimely and any alleged error is waived if the motion is made too late to give opposing counsel an opportunity to fix any deficiencies in the question or lay an appropriate foundation for the witnesses' opinion. *Seabaugh v. Milde Farms, Inc.,* 816 S.W.2d 202, 209 (Mo. banc 1991). Blanket objections during depositions are improper. *Friese v. Mallon,* 940 S.W.2d 37, 40 (Mo.App. E.D.1997). "[E]rrors of any kind that might be cured if promptly presented are waived unless seasonable objection thereto is made during the deposition." Rule 57.07(c)(4); *Keller v. Anderson Motor Service, Inc.,* 652 S.W.2d 735, 737 (Mo.App. E.D.1983). To hold otherwise would encourage delay that might be remedied with a few questions. *Washington,* 897 S.W.2d at 616.

The alleged error regarding the foundation for Dr. Young's testimony was not preserved. Further, after the objection was made the court advised the defendants' attorneys that the court would reconsider striking that one opinion even though it might highlight that part of the testimony, but otherwise would overrule the objection at that time. The defense attorneys did not ask that the opinion be stricken. Later, the court reiterated that if Dr. DeCastro's attorney had the lines in the deposition in written form so the court could tell the jury exactly which parts to disregard, he would strike them. The defense attorneys again did not seek the relief, but noted that if the court did strike the expert testimony, then the court would have to direct a verdict. Failure to ask for the testimony to be struck waived any claim for further remedial relief. *See McMillin v. Union Electric Company,* 820 S.W.2d 352, 355 (Mo.App. W.D.1991). Any error stemming from a lack of foundation is not preserved.

■ In addition, a review of both doctors' testimony convinces us that their testimony was properly admitted. The issue of what standard to apply to the admissibility of scientific evidence is that it must have "wide scientific approval of [its] reliability...." *State v. Biddle,* 599 S.W.2d 182, 191 (Mo. banc 1980). Dr. Young testified that Dr. DeCastro failed to use that degree of skill and learning ordinarily used under the same or similar circumstances when he administered tPA to Appellant because there must be clear-cut evidence of ST elevations on at least two continuous leads on an EKG before tPA is administered and Appellant had no elevated ST segments justifying the use of tPA. Dr. Young testified further that the administration of the drug by Dr. DeCastro violated the standard of care. When Appellant first went to the emergency room, Dr. DeCastro called Dr. Apprill [8] to ask whether it was appropriate to administer tPA. Dr. Apprill specifically asked Dr. DeCastro whether the EKG strops showed ST segment elevations, which must be present prior to the administration of tPA. Dr. DeCastro informed Dr. Apprill that the requisite ST segment elevations on Appellant's EKG were present. After consulting with Dr. Apprill, Dr. DeCastro wrote that he administered the tPA "as per protocol." Even Dr. Phillip Ludbrook, Dr. DeCastro's cardiology expert, testified that Appellant's EKG did not meet the criteria mentioned in the hospital protocol and the only explanation in the record for the epidural bleed was the administration of the tPA.

---

8. Dr. Apprill prepared the protocol for the administration of tPA for SSM. He testified there are well-defined protocols to administer tPA because of the risky nature of tPA. Apparently, SSM relied upon Dr. Apprill's expertise.

Dr. Young then testified that the bleeding complication from the administration of the tPA caused a blood clot to impinge on Appellant's spinal cord which led to neurological complications and paralysis. Both of the treating neurosurgeons (one of whom testified for Dr. DeCastro and SSM) testified to the causal connection between the tPA and the spinal bleed. Another of Dr. DeCastro's experts, Dr. Cheung, testified as follows:

Q. And if she testified and if the medical records indicated she had no problems with her arms and her legs before she received the TPA, and as a result of the TPA she had this bleed that led to this quadriplegia that we talked about, would it be your opinion that the bleed into the neck caused the problems with the upper and lower extremities.

A. Yes, it would.

Dr. Young testified without objection that he is an emergency medicine physician, and a member of the American College of Emergency Room Physicians and the Society for Academic Emergency Medicine. He is on the board for the State of Oregon College of Emergency Physicians. He has taught students, interns, and residents in the clinical and classroom setting. He has extensive experience in thrombolytic therapy, seeing patients daily who have a suspected myocardial infarction. He has conducted research in the area of thrombolytic therapy and authored an article in the *Emergency Medicine Clinics of America* and in an emergency cardiology textbook on the use of thrombolytic therapy. He reviewed six separate medical ar-

ticles that discussed the fact that epidural bleeds were related to the use of tPA. Dr. Young testified to the strict guidelines that were developed specifically because of the bleeding risk associated with tPA and set forth criteria as to who should and should not receive tPA.

Dr. Young was qualified to testify that but for the administration of tPA, the epidural bleed would not have occurred.[9] Generally, a physician is competent to testify in a specialty field in which he has limited experience and training. *Hiers v. Lemley,* 834 S.W.2d 729, 733 (Mo. banc 1992). "When an expert from a particular profession is called to testify, it is not normally required that he be a specialist in a particular branch of the profession." *In Interest of C.L.M.,* 625 S.W.2d 613, 615 (Mo. banc 1981). Here the combined experience and training of Dr. Young provided a sufficient basis to testify about the standard of care for a physician in Dr. DeCastro's position.

In essence, Dr. DeCastro and SSM argue that their experts are more believable. Keeping in mind that in ascertaining whether Appellant made a submissible case Appellant is entitled to the benefit of all favorable probative evidence and all favorable inferences to be drawn therefrom and defendant's evidence is to be disregarded unless it aids Appellant's case, we find a submissible case on the issue of whether the administration of tPA caused the epidural hematoma. A further discussion of Appellant's experts is unnecessary. Appellant's Point I has merit. It was er-

**9.** The court also ruled that Dr. Apprill should not have been allowed to testify. Dr. Apprill testified that tPA is known to cause bleeding. He further testified of the risk of intracranial bleeding or hemorrhage, particularly in older patients. After an objection to his expertise Dr. Apprill testified that Appellant had bleeding into the area around her spinal cord. He

said he would defer on causation to a neurologist. Even if Dr. Apprill's opinion concerning causation is ignored, his opinions concerning the standard of care were admissible as was his testimony concerning the lack of the minimum elevation level necessary on the EKG before tPA is administered.

ror to find that Appellant failed to make a submissible case based on the testimony of Appellant's experts.

In Point II, Appellant contends the trial court erred in granting a new trial based on an error in Instruction 7. Instruction 7 states:

Your verdict must be for the plaintiff and against defendants, if you believe:

First, Dr. DeCastro either:

administered tpa when it was not indicated by Sally Brook's EKG, or

infused tpa at a rate which exceeded hospital guidelines, and

Second, Dr. DeCastro, in any one or more of the respects submitted in paragraph First, was thereby negligent, and

Third, as a direct result of such negligence, plaintiff sustained damage.

Dr. DeCastro claims Instruction 7 allowed the jury a "roving commission." "A 'roving commission' occurs when an instruction assumes a disputed fact or submits an abstract legal question that allows the jury 'to roam freely through the evidence and choose any facts which suited its fancy or its perception of logic' to impose liability." *Seitz*, 959 S.W.2d at 463 (quoting *Davis v. Jefferson Savings & Loan Association*, 820 S.W.2d 549, 556 (Mo.App. E.D.1991)). If an instruction fails to advise the jury what acts or omissions of the party would constitute liability, the instruction is a roving commission. *Centerre Bank of Kansas City, National Association v. Angle*, 976 S.W.2d 608, 617 (Mo.App. W.D.1998). Likewise, a jury instruction may also be considered a roving commission when it is too general or where it submits a question to the jury in a broad, abstract way without any limitation to the facts and law. *Id.*

We examine assertions of instructional errors as questions of law. *Lashmet*

*v. McQueary*, 954 S.W.2d 546, 549 (Mo. App. S.D.1997). The primary argument concerning the instruction replicates Dr. DeCastro's argument that no evidence supported the verdict instruction because the experts' testimony was inadmissible. We have discussed and rejected that argument under Point I. We next address whether the instruction was so vague as to fail to inform the jury what facts they must determine.

Dr. DeCastro cites to *St. Joseph's Hospital of Kirkwood v. Schierman*, 829 S.W.2d 4 (Mo.App. E.D.1991) as a case where a similar jury instruction was found to be a roving commission for the jury. In fact, the first two components of the jury instruction in that case, which were not challenged on appeal, alleged specific theories of negligence very similar to the two grounds of negligence alleged in Instruction 7. The court in *St. Joseph's Hospital* found fault for giving inadequate guidance regarding the submission of a general theory of negligence that the doctor "failed to adequately communicate" with another doctor regarding the giving of the drug Aramine. 829 S.W.2d at 6.

Instruction 7 gave the jury two choices of specific acts constituting negligence, administrating tPA when it was not indicated by the EKG or infusing tPA at a rate exceeding hospital guidelines. The instruction was not a roving commission. As discussed earlier there was evidence from Dr. Young and Dr. Apprill regarding the administration of tPA when it was not indicated by Appellant's EKG. They testified as to the protocol that indicates that there must be an elevation of at least one millivolt on an EKG. That elevation was not present in Appellant's EKG.

Evidence that Dr. DeCastro exceeded hospital guidelines when he infused the tPA was presented as well. Dr. Apprill

testified as to the hospital protocol. SSM has a written protocol for the administration of tPA. For a person the size of Appellant, the protocol was to "infuse 15–milligram bolus over one to two minutes, then 50 milligrams over 40 minutes, then 35 milligrams over 60 minutes. At the end of the infusion add 20 cc's of saline to the bag to flush the tubing of the tPA." Although Dr. DeCastro testified that the infusing pump was programmed to infuse the last thirty-five milligrams over the next sixty minutes per the protocol, there was conflicting testimony regarding the delivery of the final dose of tPA.

The registered nurse who was in the emergency room testified that Dr. DeCastro ordered her to infuse the remaining twenty-eight milligrams into Appellant; however, she refused, stating that the administration by that method was not part of the hospital protocol. Dr. DeCastro has no memory of that discussion although it is in the hospital chart and was part of the nurse's testimony. The nurse left the room only to return to find the bottle empty and Dr. DeCastro next to the empty bottle. The I.V. delivering the tPA had been disconnected from Appellant. This evidence supports the giving of Instruction 7 that Dr. DeCastro infused tPA at a rate that exceeded the hospital guidelines. It was for the jury to resolve the factual issue of whether Dr. DeCastro exceeded the hospital protocol when administering the tPA.

▪ The next challenge to the instruction by Dr. DeCastro was that the evidence did not support a finding that either of the two actions by Dr. DeCastro were negligent and that the evidence does not support the submission that the damages were caused as a direct result of the negligence. We have addressed the standard of care argument and found sufficient evidence to support a finding that these actions would be negligent. As for the causation of damages, the reasonable inference from the medical testimony was that the spinal bleed necessitated further surgeries and caused permanent weakness for Appellant.

▪ While we have noted Dr. Young's testimony, there was additional testimony from Dr. Margolis regarding causation. Dr. Margolis testified the use of tPA caused the epidural bleeding in Appellant's cervical spine. He further testified that Appellant's weakness, the difficulty standing, the difficulty walking, the abnormal position of her legs, the weakness in her arm, her incontinence, and her sensory changes were related to the spinal cord injury from the blood clot. Dr. DeCastro contests the qualifications of Dr. Margolis because he claims Dr. Margolis's knowledge of tPA was limited to the drug as it applies to strokes and not to the heart. Dr. DeCastro claims there is no factual or scientific basis for Dr. Margolis's conclusion.

▪ Dr. Margolis is a Clinical Professor of Neurology at Washington University and is in active practice as a neurologist. He is board certified in both neurology and internal medicine. He has used tPA regularly in stroke patients and was one of the principal investigators of the effect of tPA in stroke patients. He testified that the greatest risk posed by tPA is hemorrhage. That opinion certainly was not disputed by anyone else at trial, including the experts retained by the defendants.[10] Again, Dr.

10. Dr. DeCastro argues that "for science to be reliable there must be scientifically reproducible results. ...Plaintiff's witnesses admit that there are no studies known in the United States or the world in which intra-spinal bleeding can be and have been scientifically reproduced." We will assume he is not suggesting that tPA, a drug used to dissolve clots,

DeCastro simply argues that he had better experts who had different opinions. A difference of opinion does not negate the opinions of Appellant's experts. If the experts were qualified, which we have found that they are, the credibility of the experts is left to the sound discretion of the jury. Experience and competence of the medical expert goes to the weight of his testimony, not admissibility. *MacDonald v. Sheets*, 867 S.W.2d 627, 630 (Mo.App. E.D.1993). The trial court erred in determining that there was insufficient evidence to support Instruction 7.

▮▮▮▮▮ Appellant next contends that the trial court erred in finding there was no evidence of future economic damage as defined in MAI 21.05 because there was sufficient evidence that future medical expenses would be reasonably probable. Taken directly from the jury instruction, " 'future economic damages' means those damages arising in the future for expenses such as necessary drugs, canes, walkers, custodial, hygiene, and rehabilitative services." To support the award of future damages, Appellant had to adduce competent medical evidence demonstrating the future physical conditions that are the basis for the damages stem from the original injury and will occur. *Zoeller v. Terminal Railroad Association of St. Louis*, 407 S.W.2d 73, 78 (Mo.App.1966).

Testimony indicated that prior to the injury Appellant enjoyed fishing, camping, crocheting, sewing, and canning and freezing food. She was able to go up and down stairs. The week before she was hospitalized she walked throughout the French Quarter in New Orleans. At the time of trial, Appellant needed assistance and home care on a daily basis to care for her and do housework. She uses a walker, cane, and a bench in her bathtub, but still falls frequently because of difficulty keeping her balance. As noted herein, the medical testimony indicates the injury caused weakness on Appellant's right side, bladder dysfunction, difficulty standing and walking, reflex changes, and abnormal positioning of her leg. The injuries were considered permanent. There was evidence the bleed caused atrophy in Appellant's spine. From defendants' expert came testimony that Appellant's spinal injury was complicating a disk injury in her lower back, thus necessitating future surgery. There was medical evidence that Appellant would suffer from future economic damages.

▮▮▮▮▮ On appeal, a jury's determination of damages will not be disturbed unless the amount is so grossly excessive that it shocks the conscience of the court. *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 871 (Mo. banc 1993). Each case is considered on its own facts to determine what will "fairly and reasonably compensate" an injured party. *Kenton v. Hyatt Hotels Corporation*, 693 S.W.2d 83, 97 (Mo. banc 1985). Given the severity of the injury to Appellant and the testimony of further complications because of the damage to the spine, we find the trial court erred in finding there was no evidence of future economic damage.

Because we find that Appellant made a submissible case, we reverse the trial court's granting of a new trial and remand for the court to reinstate the jury verdict and entry of judgment consistent with that verdict.

PREWITT and PARRISH, JJ., concur.

---

should be injected into patients without clots to test for inter-spinal bleeding before the

science would be reliable.